[No. 1302-1. Division One—Panel 1. July 24, 1972.]

*In the Matter of the Welfare of* JOHNNY LEE SEGO *et al., Minors.*

458

*John R. Ward,* for petitioner.

*Earl F. Angevine, Prosecuting Attorney,* and *Gilbert E. Mullen, Chief Deputy,* for respondent.

HOROWITZ, C.J.—This is an appeal from a juvenile court order permanently depriving Ronnie L. Sego of the custody

of his daughter, about 5, and his son, about 3½ years of age. The controlling issue, among others involved, is whether the findings on which the deprivation order is based are supported by clear and convincing evidence. We hold that they are not and remand the case for additional testimony.

Sego, apparently a young man, returned in 1960 with an honorable discharge after 3 years of army service. While in the service, he acquired a habit of excessive drinking which he continued upon his return. He testified, "I would get emotionally upset and couldn't control myself." Following a history of marital discord, he shot and killed his wife, the mother of his two children. At that time the daughter was a little over 2 and the son about 9 months of age. The court found that "during these drinking periods the father . . . evidenced a vicious, mean disposition, which culminated in the killing of the mother of said children." Finding 3. Following the killing, Sego pleaded guilty to second-degree murder and also pleaded guilty to armed robbery and escape. In March 1969 the court sentenced him to concurrent prison terms, 25 years on the first two convictions, and 10 years on the third. Sego has been serving his terms in Walla Walla ever since.

On January 9, 1969, at an emergency hearing after Sego's arrest, the Clallam County Juvenile Court, upon the assumption that the children were "dependent" within the meaning of the juvenile court act, made the children wards of the court and authorized their placement in a foster home. On January 24, 1969, the juvenile court, after a hearing in which Sego was represented by counsel, reaffirmed the dependent status of the children and continued their foster home care under the supervision of the (then) State Department of Public Assistance. On April 25, 1969, a further hearing was held. Sego was again represented by counsel. The Clallam County Juvenile Court reaffirmed the dependency and wardship status of the children, awarded the children's temporary custody to their maternal aunt and her husband, Mr. and Mrs. William Lee Johnson of

Skagit County, Washington, and transferred jurisdiction over the children to the Skagit County court below, juvenile department.

Meanwhile, Sego made an especially good record of rehabilitation at the Walla Walla penitentiary. He took active steps to stop his drinking habit and, in connection therewith, became active in Alcoholics Anonymous. He took advantage of counseling and therapy services, attended Bible classes, and enrolled in an 18-month course at Walla Walla Community College to help qualify himself as a machinist. As a result, he secured a 5-year reduction in his sentences. This reduction meant that with good behavior, he was scheduled for release November 11, 1980. In addition, Sego was scheduled for a progress hearing in April 1972 which could result in early release. The evidence showed that his prospects for release by October 1972, when he completes his machinist's course, are good. The evidence also showed that he could probably qualify for minimum security furlough status. Such status would enable Sego to go on furlough outside of prison from time to time to visit his children. The court found:

> That while evidence was introduced, tending to indicate that Mr. Sego has a remarkable record in rehabilitation at the Department of Institutions, such apparent rehabilitation is against a background of the structured life at the penitentiary, where he has endured none of the responsibilities attendant his duties as a father and head of the household.

Finding 5.

Following the award of temporary custody of the Sego children, the Johnsons established a fine home for them. According to a December 3, 1970 report prepared by Mr. Paradis of the Department of Social and Health Services, Division of Public Assistance, the Johnsons gave the children excellent care and wanted to adopt them. The report states "the Sego children have . . . acquired a much needed sense of being loved, secure, and belonging on a permanent basis." The report then

strongly recommend[ed] that Ronnie Lee Sego be permanently and totally deprived of all rights to care for said minors . . . and that.[the children] be placed in adoptive status with responsibility for placement . . . to be with the Department of Social and Health Services.

The report stated that Sego's expected release date from Walla Walla would be November 11, 1985. Prior to the Paradis report, the department had opposed visits by the children to their father, although no juvenile court order forbade them. The children visited the father on only one occasion when taken to Walla Walla by Sego's parents. The Paradis report does not show that Mr. Paradis ever met Sego.

On February 24, 1971, the court's probation officer and Mr. Paradis, the latter acting on behalf of the department, filed the petition below. The petition referred to "the murder of his wife." It stated that Sego would not, in the "foreseeable future [be] capable of providing for the care, control and custody of the said minor children." It alleged that the children were "entitled to a home situation that approximates as nearly as possible a natural home." The petition prayed that the court "consider permanent deprivation of these minor children from their father . . ." and that consideration be given to alternative relief.

At the hearing below, petitioners were represented by the Skagit County prosecuting attorney. Sego appeared in person and by his attorney. The children appeared by a Skagit County attorney appointed by the court as guardian ad litem for the children, and who filed a report with his recommendations. The Johnsons, although not parties to the proceedings, appeared by their attorney who participated through the guardian ad litem. At the conclusion of the hearing, the court filed a memorandum decision favoring permanent deprivation, and stated:

This Court does not reach this decision easily nor with peace of mind. Mr. Sego has the strongest of all rights known to the law in his claim for his blood children. He presents a very sympathetic and appealing picture as one who has attempted with all his strength to rehabilitate

himself, cure his unfortunate habits, and overcome his past rash behavior. He indicates a deep love and concern for his children, and a real desire to reunite with them.

. . . [Nevertheless] [h]aving undertaken their care and protection, the Court must do all it can, consistent with the facts of the case, to permit of [sic] a happy normal, well-adjusted life for these small, innocent children.

He then entered findings, conclusions and order permanently depriving Sego of the custody of his children and placing them in adoptive status. On December 27, 1971, he entered a further order denying Sego any further visitation rights of his children. This appeal followed.

■ Sego makes three assignments of error. He first contends the deprivation order deprives him of his children "in violation of petitioner's constitutional rights." He cites Const. art. 1, §§ 3, 15. Thus, he contends the transfer of jurisdiction over the children from the Clallam County Juvenile Court to the court below was invalid because unauthorized by statute. Were such a contention to be accepted, the power of a juvenile court to best protect the welfare of a dependent child would be seriously impaired by an unnecessarily narrow interpretation of the court's power. RCW 13.04.140 requires the juvenile court act to be

liberally construed . . . that its purpose may be carried out, to wit: that the care, custody and discipline of a dependent . . . child . . . shall approximate as nearly as may be that which should be given by its parents, and in all cases where it can be properly done, the dependent . . . child . . . shall be placed in an approved family . . .

Furthermore, the court is expressly empowered to change, modify or set aside orders "as to the judge may seem meet and proper." RCW 13.04.150.

These statutes are sufficiently broad to authorize the discretionary transfer of jurisdiction to another county in this state in which the custodian resides in order to better supervise the wardship in the best interests of the children. *See also McClain v. Superior Court,* 112 Wash. 260, 191 P.

852 (1920). Sego relies on *In re Blake*, 21 Wn.2d 547, 151 P.2d 825 (1944). That case, however, did not involve a transfer of jurisdiction. It involved an independent exercise of jurisdiction by a juvenile court in one county without the knowledge or consent of the juvenile court having continuing jurisdiction in another county.

■ Sego then contends that the court below had no jurisdiction to enter the order appealed from because the children were not "dependent" within the meaning of RCW 13.04.010. It is clear that unless the children are in dependent status, the juvenile court is without jurisdiction to terminate Sego's rights of permanent custody. *In re Hudson*, 13 Wn.2d 673, 126 P.2d 765 (1942).

Sego claims the children are not dependent because, from the beginning, both the paternal and maternal relatives of the children have been willing to provide support, care and maintenance for the children. We disagree with Sego's contention. The willingness and ability of other relatives to furnish the children's support and maintenance does not destroy the otherwise existing dependency status of such minor children. *See Ex parte Willig*, 314 S.W.2d 395 (Tex. Civ. App. 1958); *Bee v. Robbins*, 303 S.W.2d 827 (Tex. Civ. App. 1957); *In re Darst*, 117 Ohio App. 374, 192 N.E.2d 287 (1963).

RCW 13.04.010 defines a dependent child as one under 18:

(1) Who has no home . . .; or

(2) . . . who has no parent or guardian . . . capable of exercising, proper parental control; . . .

In the instant case the children were dependent because they had "no home" (*see In re Day*, 189 Wash. 368, 65 P.2d 1049 (1937)), and have had no parent "capable of exercising, proper parental control." The mother is dead and the father is serving his sentences.

■ Const. art. 1, § 15 does not apply. It provides "No conviction shall work corruption of blood, nor forfeiture of estate." As *Avery v. Everett*, 110 N.Y. 317, 324, 18 N.E. 148 (1888), points out:

There were three principal incidents consequent upon an

attainder for treason or felony, viz., forfeiture, corruption of blood and an extinction of civil rights, more or less complete, which was denominated civil death. Forfeiture was a part of the punishment of the crime, and was of Saxon origin, by which the goods and chattels, lands and tenements of the attainted felon were forfeited to the king, the former absolutely on conviction, and the latter perpetually, or during the life of the offender, on sentence being pronounced. The doctrine of corruption of blood was of feudal origin, introduced after the Norman Conquest. The blood of the attainted person was deemed to be corrupted, so that neither could he transmit his estate to his heirs, nor could they take by descent from the ancestor.

In the instant case, Sego's convictions do not prevent him from willing his property to his children, nor are his children prevented from inheriting from their father unless they are adopted. RCW 11.04.085. Furthermore, his convictions do not cause a forfeiture of his estate.

■ Sego's remaining assignments of error deal with claimed improper admission of evidence and the insufficiency of the evidence to support the findings and conclusions. The findings are not set out in the appellant's brief as required in CAROA 43. In the absence of reviewable findings, claimed error in the admission of evidence is likewise nonreviewable. *Simpson v. Hutchings,* 41 Wn.2d 287, 248 P.2d 572 (1952); *Jones v. Bard,* 40 Wn.2d 877, 246 P.2d 831 (1952); *State v. Duarte,* 4 Wn. App. 825, 484 P.2d 1156 (1971). Nevertheless, otherwise nonreviewable assignments of error may be reviewed in order to prevent an "obvious and manifest injustice." *See State v. Louie,* 68 Wn.2d 304, 312, 413 P.2d 7 (1966). Few issues are of more vital importance to parents and children than the father's permanent loss of his children and the children's permanent loss of their father.

■ In view of the disposition we later make, it is sufficient to refer but briefly to the errors assigned by Sego concerning improper admission of evidence. There is no question that rules of evidence must be followed in depri-

vation hearings, which are adversary in nature. *Cf. State v.* *Piche,* 74 Wn.2d 9, 442 P.2d 632 (1968); *Williams v. Rhay,* 73 Wn.2d 770, 440 P.2d 427 (1968); *Sheppard v. Rhay,* 73 Wn.2d 734, 440 P.2d 422 (1968). Furthermore, full inquiry on the issue of parental fitness and child welfare, in conformity with the rules of evidence, is proper. *In re Ross,* 45 Wn.2d 654, 277 P.2d 335 (1954). Even if evidence is erroneously admitted, the admission does not constitute reversible error unless prejudicial.

Sego complains that the Skagit County sheriff's testimony was improperly admitted over his objection on the grounds of remoteness and relevancy. The testimony referred to several incidents, one in 1961, one in 1967, and the last in 1969, shortly after the arrest. The question of relevancy and remoteness, as in other cases, is in the trial court's discretion, reviewable only for manifest abuse of discretion. *Jacobs v. Brock,* 73 Wn.2d 234, 437 P.2d 920 (1968); *Coleman v. Dennis,* 1 Wn. App. 299, 461 P.2d 552 (1969). We find no abuse here. The weight of such evidence is another matter.

Sego also objects to the opinion testimony given both by the petitioner juvenile probation officer and Mr. Paradis' casework supervisor. He is especially critical of the weight apparently given to that opinion testimony. However, he neither objected to the testimony of the casework supervisor, nor moved to strike it. He cannot now claim error on account of its admission. *Burke v. Pepsi-Cola Bottling Co.,* 64 Wn.2d 244, 391 P.2d 194 (1964).

Sego did, however, object to the qualifications of the juvenile probation officer to testify that a denial of the petition would be harmful to the children. The testimony was not given in response to a hypothetical question. *See* *Vaupell Indus. Plastics, Inc. v. Department of Labor & Indus.,* 4 Wn. App. 430, 481 P.2d 577 (1971). It is, therefore, difficult to determine just what facts she relied on in expressing her opinions. There was no showing that she had ever seen or interviewed Sego. Notwithstanding her gen-

eral educational background, her qualifications to express the opinions she expressed, without interviewing Sego and the children, were at best debatable. Had the court sustained Sego's objection to her qualifications, we would have upheld his ruling as a proper exercise of discretion. *See In re Western Ave.,* 57 Wash. 290, 106 P. 901 (1910). *Cf. North Coast R.R. v. Gentry,* 58 Wash. 82, 107 P. 1060 (1910). During her cross-examination it appeared she had talked to the children on only one occasion, when she took them to be interviewed by Dr. Kaufman, a psychiatrist. However, there was no showing of the nature or extent of the information she then received, except there was no conversation concerning the children's father. Had testimony concerning the matter disclosed by cross-examination been brought out on direct examination, we could not say that the court would have exhibited a manifest abuse of discretion in admitting the opinion testimony objected to. *Weber v. Biddle,* 72 Wn.2d 22, 431 P.2d 705 (1967); *Ward v. J. C. Penney Co.,* 67 Wn.2d 858, 410 P.2d 614 (1966). However, under the circumstances, we cannot say that the error, if any, in admitting the testimony was prejudicial. The weight of the testimony is another matter.

We recognize that we may not substitute our findings for those of the trial court if the findings are supported by substantial evidence. *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959). If, however, the findings are not so supported, *Thorndike* does not apply. Thus, scintilla evidence is insufficient to support a finding. *Hewitt v. Spokane, P. & S. Ry.,* 66 Wn.2d 285, 402 P.2d 334 (1965). *See State v. Zamora,* 6 Wn. App. 130, 491 P.2d 1342 (1971). Similarly, a mere preponderance of the evidence does not meet the higher standard of "clear, cogent and convincing" evidence. *In re Estate of Reilly,* 78 Wn.2d 623, 479 P.2d 1 (1970); *Holmes v. Raffo,* 60 Wn.2d 421, 374 P.2d 536 (1962). As *Reilly* points out, 78 Wn.2d at 640, in overturning the trial court's findings on testamentary capacity and undue influence, "Evidence which is 'substantial' to support a preponderance may not be sufficient

to support the clear, cogent, and convincing requirements with which we are faced. "

An appellate court called to determine whether substantial evidence supports a finding may properly review the evidence to determine if it is clear, cogent and convincing. *In re Estate of Reilly, supra. See Frate v. Rimenik,* 115 Ohio St. 11, 152 N.E. 14 (1926); *Earnst v. Earnst,* 418 P.2d 351 (Okla. 1966). Should the appellate court find the requisite standard of proof has not been met, then it may be said the exercise of the court's discretion, based upon such unsupported finding "has been exercised upon a ground, or to an extent, clearly untenable or manifestly unreasonable." *Friedlander v. Friedlander,* 80 Wn.2d 293, 298, 494 P.2d 208 (1972). Neither wrong purpose nor bad motive is implied in reaching such a conclusion. *See generally* R. Bowers, The Judicial Discretion of Trial Courts §§ 11, 12 (1931).

The natural parent's right to the custody and control of his minor child is a "sacred right." *In re Hudson, supra.* It is a right protected by the state and federal due process clauses. *Stanley v. Illinois,* 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208 (1972); *Sheldon v. Sheldon,* 47 Wn.2d 699, 289 P.2d 335 (1955); *In re Petrie,* 40 Wn.2d 809, 246 P.2d 465 (1952). It is a right to be abridged only "for the most powerful reasons." *In re Day, supra.* The remedy should be one "imperatively demanded." *See In re Neff,* 20 Wash. 652, 655, 56 P. 383 (1899), quoted with approval in *In re Ward,* 39 Wn.2d 894, 896, 239 P.2d 560 (1952). A "clear" case must be proved. *State ex rel. Cummings v. Kinne,* 8 Wn.2d 1, 11, 111 P.2d 222 (1941). *See Barstad v. Barstad,* 74 Wn.2d 295, 298, 444 P.2d 691 (1968). A "plain showing" should be made out. *In re Ward, supra* at 897, quoting *Penney v. Penney,* 151 Wash. 328, 335, 275 P. 710 (1929). As stated in *In re Lybbert,* 75 Wn.2d 671, 674, 453 P.2d 650 (1969), "courts zealously guard the integrity of the natural relation of parent and child."

The phrases "powerful reasons", "imperatively de-

manded", "clear case" and "plain showing" support the conclusion that a clear, cogent and convincing showing must be made to justify the entry of an order of permanent deprivation. A "clear" showing is in substance a "clear, cogent and convincing" showing. "Cogent" is a synonym for "clear" and "convincing" is a synonym for "cogent". J. Rodale, The Synonym Finder (1961). The so-called "highly probable" test recently adopted in *State v. Blubaugh*, 80 Wn.2d 28, 491 P.2d 646 (1971) has been held the equivalent of "clear and convincing evidence." *Supove v. Densmoor*, 225 Ore. 365, 358 P.2d 510 (1961). The highly probable test differs from the preponderance test in that the latter merely requires that a fact at issue be shown by evidence to be more probably true than not. *Presnell v. Safeway Stores, Inc.*, 60 Wn.2d 671, 374 P.2d 939 (1962). *See generally* Wiehl, *Our Burden of Burdens*, 41 Wash. L. Rev. 109 (1966).[1]

The occasions for an order of permanent deprivation include those described in RCW 26.32.040 dealing with the grounds when, in adoption cases, the consent of the natural parent is excused. On the issue of parental fitness, in the absence of other grounds, it is difficult to improve upon the phrase "wilful substantial lack of regard for parental obligations" used in RCW 26.32.040(4). *See In re Lybbert, supra, cf.* RCW 13.04.140. A father's inability to

---

[1]In cases involving separating a child from his parents, including cases of permanent deprivation, there is substantial outside case support for the "clear", "cogent and convincing", "clear and convincing" and "clear, cogent and convincing" evidence rules. *In re Simmons Children,* ............ W. Va. ......, 177 S.E.2d 19 (1970); *State ex rel. Kiger v. Hancock,* 153 W. Va. 404, 168 S.E.2d 798 (1969); *Spence-Chapin Adoption Serv. v. Polk,* 29 N.Y.2d 196, 274 N.E.2d 431, 324 N.Y.S.2d 937 (1971); *In re Sarver,* 444 Pa. 507, 281 A.2d 890 (1971); *In re Rogers,* 492 P.2d 324 (Okla. 1971); *Green v. Sherman,* 173 N.W.2d 843 (Iowa 1970); *Roe v. Doe,* 29 N.Y.2d 188, 272 N.E.2d 567, 324 N.Y.S.2d 71 (1971); *Potter County Child Welfare Unit v. Charlow,* 454 S.W.2d 214 (Tex. Civ. App. 1970).

In some cases, the clear, cogent and convincing evidence rule is required by statute. *In re Taylor,* 419 S.W.2d 473 (Mo. App. 1967); *In re M_____,* 446 S.W.2d 508 (Mo. App. 1969).

perform his parental obligations because of imprisonment is bound up with the issue of parental fitness and child welfare. Imprisonment, per se, however, is insufficient to justify an order of permanent deprivation. *In re Staat,* 287 Minn. 501, 178 N.W.2d 709 (1970). On the other hand, the fact and cause of imprisonment are properly considered in resolving the issue of permanent deprivation. *In re Staat, supra* at 713. *See* RCW 26.32.040(1). The court seeks to protect both the rights of the parent and the rights of the child. *Sheldon v. Sheldon, supra* at 703. Furthermore, findings in permanent deprivation cases should be prepared with a "high degree of particularity". *Wallin v. Wallin,* 290 Minn. 261, 187 N.W.2d 627 (1971).

The integrity of the parental relationship is at least as important as the integrity of a legal instrument such as a contract or a deed when reformation is sought for mutual mistake. In the latter case, reformation will not be granted merely on a showing of possible, or even probable, error. Preponderance of the evidence is not enough. The evidence must be "clear, cogent and convincing" sufficient to establish "certainty of error." *Neal v. Green,* 71 Wn.2d 40, 426 P.2d 485 (1967); *Slater v. Murphy,* 55 Wn.2d 892, 339 P.2d 457, 351 P.2d 515 (1959); *Mulhausen v. Nalley's, Inc.,* 42 Wn.2d 700, 258 P.2d 459 (1953); *Bergstrom v. Olson,* 39 Wn.2d 536, 236 P.2d 1052 (1951). Such certainty exists in a "clear case." A case cannot be said to be made out by clear and convincing evidence if there is a serious or substantial doubt concerning the correctness of the conclusion sought. *Paulsen v. Coombs,* 123 Utah 49, 253 P.2d 621 (1953).

In reviewing an order of permanent deprivation, it is to be remembered that such an order utilizes a remedy of utmost severity and harshness. A temporary change of custody is capable of later change. A final order of deprivation, especially when followed by adoption, is virtually irreversible. The difference in the severity of the remedies imposed requires a more substantial showing to support a case of deprivation than to support relief less drastic. Thus, an order providing for temporary, divided or partial custody

will be upheld even without having to go so far as to show that the father has abandoned or disowned his child, or that he has willfully or consciously refused to perform his parental obligations, or that he has followed a consistent pattern of child abuse or cruelty. Yet, in the absence of other grounds, a showing of "willful substantial lack of regard for parental obligations" should be required if an order of permanent deprivation is to be entered. *See In re Lybbert, supra* at 675.

▇▇▇ It is recognized that parental custodial rights, although not to be ignored, must yield to the welfare requirements of the child. *Sheldon v. Sheldon, supra* at 703. The child's welfare includes regard for the child's physical, mental, moral and emotional development. Under Washington law, in the words of *Myers v. Myers,* 21 Wn.2d 19, 21, 149 P.2d 926 (1944), dealing with custody, "We have said many times that each case must be considered upon its own facts and the situation then before the court." This means that a parent's misconduct, whether or not criminal in character, does not necessarily and automatically give rise to permanent child deprivation. It is still a matter for factual determination whether the conduct is of such character as to demonstrate parental unfitness and substantial interference with the child's welfare. If parental traits of character are shown to be capable of correction, such traits may not require deprivation. *See In re Sickles,* 42 Wn.2d 17, 252 P.2d 1063 (1953). It would be inappropriate, however, to use deprivation of custody as a method of punishment. *Thompson v. Thompson,* 56 Wn.2d 244, 352 P.2d 179 (1960). No doubt permanent deprivation is justified to avoid permanent damage to the children. Before resorting to the drastic irreversible remedy of deprivation, however, alternatives must be considered. Thus, a loving aunt and uncle may be willing to continue as temporary custodians to give their niece and nephew a feeling of security and a "needed sense of being loved" even if the court declines to enter an order of permanent deprivation. The availability of such an alternative might reasonably militate against the

entry of an order of permanent deprivation in the absence of further clear and convincing evidence that permanent deprivation is nevertheless required. See generally, on considerations pertinent to custody matters, H. Clark, Domestic Relations §§ 17.2, 17.4(c), 17.5, 17.7 (1968).

The record here raises a serious doubt whether the findings in support of the permanent deprivation order are supported by clear and convincing evidence. The court's deprivation order is predicated in substantial part on the finding that permanent deprivation is required "if permanent damage [to the children] is to be avoided." Finding 8. The findings, including finding 8, and the conclusions based thereon, rest in substantial measure on expert testimony introduced on behalf of petitioners.

Petitioner Paradis, author of the December 3, 1970 report recommending permanent deprivation, had worked with the children and the Johnsons, but did not report having ever met or interviewed Sego. He did not testify. The only expert witnesses testifying in support of the deprivation order were the petitioner juvenile probation officer and the casework supervisor of petitioner Paradis. Sego is strongly critical both of the qualifications of either witness to testify and of the weight apparently attached to their testimony. It would unduly prolong this opinion to summarize the entire testimony of each of these witnesses. It is to be noted, however, that notwithstanding each witness had general educational qualifications, neither testified on the basis of any personal interview had with Sego, and the casework supervisor had never even seen, much less interviewed, the children. We have already pointed out the juvenile probation officer had seen the children on only one occasion in July 1971, and the very limited nature of the information she then received as disclosed by the record. Prior to the hearing, she had assumed that Sego's prison term would end in 1985. This assumption appears to have been an important factor in the opinion she expressed. She

conceded "If I knew for a fact it was going to be much sooner then my recommendation might be changed."

The casework supervisor testified concerning her familiarity with the children based on her familiarity with "their record" and "their general living conditions." She was present during the court proceedings and heard the testimony. She "familiarized herself with some of the exhibits, including the report of Dr. Kaufman," she being a former student of Dr. Kaufman. To what extent she considered Sego's rehabilitation status does not specifically appear. She testified that based on her educational background, experience and knowledge of the case, she believed "very strongly that the deprivation should be completed and the children should be legally free." She believed deprivation should be promptly had. The reasons she relied on were "the age of the children and the trauma the children have already gone through." She testified that "whether Mr. Sego is in prison or not is really beside the point" because "there is no way we can erase what happened and the children are going to require . . . a great deal of stability in a normal-type family as we must raise children." Neither she nor the juvenile probation officer gave any testimony concerning whether, if the court denied permanent deprivation, nevertheless, because of the love that the Johnsons had for the Sego children, the Johnsons, in the children's interest, would seek to have them "gradually accept the tragedy of the whole thing."

Dr. Kaufman, the psychiatrist, apparently found it necessary to interview the children before he expressed an opinion on the matter of permanent deprivation. He, too, had never interviewed Sego. He prepared a report dated August 20, 1971, which was admitted into evidence by agreement of the parties. In that report he stated he had received two letters, one from the director of the Mental Health Unit at the penitentiary, and the other from the Division of Public Assistance, Mount Vernon office, "concerning the record of the Sego family . . ." The record does not disclose the information contained in either letter.

He further reported that he interviewed the children in July 1971, and at the same time saw Mrs. Johnson. Dr. Kaufman's report states:

[I]t was apparent that the children have had good care recently. They both appeared healthy both physically and emotionally. They related to each other and to their aunt very well. . . .

Rhonda talked about her father, stated that she hadn't seen him for some time. She also talked about her grandparents, all in a very positive way. All in all, I would say that the Sego children . . . are functioning quite well within their age limits and show good bright intelligence. The little boy has no knowledge of the situation with his father or his late mother. The little girl is aware of the situation to the extent of her ability to make reasonable judgment at the age of four years, nine months, which is certainly limited.

The report continues:

I can only say that there is certainly no indication that Rhonda and John Sego should not be returned to their father upon his release from the penitentiary and can show that he can provide a stable home and has consistent employment. Certainly, because of his incarceration, even on the crime of homicidal action in relation to their mother, he should not have to suffer being deprived of his children. . . .

Therefore, it would be my professional opinion that the children should not be arbitrarily removed from Mr. Sego's eventual custody just because of his incarceration but, on the other hand, he should have an opportunity of proving his stability and capability of setting up a suitable home for the children within a prescribed period of time after his release from the penitentiary before the children would or should be placed with him.

The guardian ad litem, appointed by the court to represent the minor children, filed his report and recommendations September 1, 1971. At that time Dr. Kaufman's report had not been received. The guardian ad litem's report reviewed Sego's history and the results of the guardian ad litem's visit to the Johnson home where he first met the two children. He stated that the children appeared "to be

happy and appear to have adjusted very well to this home environment," and that "Mrs. Johnson . . . and her husband are desirous of adopting the two Sego children." Concerning the father, he reported:

Ronnie Lee Sego is a quiet well-mannered and sensitive individual. He has apparently been able to adjust to this situation with his wife, and has evidently adjusted quite well at the State Penitentiary. . . . [F]rom the very beginning Mr. Sego has been concerned about the welfare of the children. . . .

The guardian ad litem assumed that Mr. Sego's probable date of release from the penitentiary would be "within some three to four years." He nevertheless stated:

It is my opinion that the welfare of the two minor children would not be served by granting the petition of the Juvenile Department to deprive Mr. Sego of these rights. I believe Mr. Sego would be able to provide a suitable home and environment for these two children upon his release from the State Penitentiary. If the deprivation petition were granted, it would put the children in the situation of having in effect lost both their parents, instead of just one. I recognize that the trauma associated with the murder of one parent by the other is particularly powerful. However, I believe both children will be able to adjust to the situation in the custody and control of their natural father, Ronnie Lee Sego.

At the time of the hearing, no one knew for certain the outcome of Sego's progress hearing then scheduled for April 1972 on the matter of early release. Sego's prison counselor and the Protestant chaplain at the penitentiary were each hopeful for a favorable outcome of the progress hearing. Furthermore, with the consent of the interested parties, the court took judicial notice of the juvenile court hearings held in Clallam County in January and April 1969. However, only the statement of facts and orders from the April hearing have been incorporated into the record on appeal. We are handicapped in our review of the findings without the records of the January 1969 hearings.

The court's memorandum decision, which preceded the entry of findings, expressly states that the court did not

"reach this decision easily nor with peace of mind." The court's difficulties may have been caused, at least in part, by the nature of the evidence on which he was compelled to rely. Had a clear case been made out, the court might not have felt it necessary to express the doubts to which he refers in his memorandum decision.

 On this state of the record, additional evidence should be taken to remove any serious doubt concerning the propriety of the orders appealed from. The genuine concern of everyone connected with this case for the children's welfare is apparent. The children are still wards of the trial court, entitled to its continuing protection. The issue of permanent deprivation—the real controversy—needs further exploration. That need can best be met by remand for taking additional evidence rather than dismissal for want of convincing evidence. The propriety of such remand comes within the principle well stated in 5 Am. Jur. 2d *Appeal and Error* § 974 (1962):

> If, on reversal, it appears that a proper judgment cannot be rendered until fact issues are resolved, and the record is not such as to permit the resolution of those issues by the appellate court, that court will ordinarily remand to the trial court with directions to determine the issues in question and then apply to those facts the law as determined on the appeal.

*Wallin v. Wallin, supra. See Daugherty v. Daugherty,* 260 Iowa 878, 151 N.W.2d 569 (1967); *Lager v. Berggren,* 187 Wash. 462, 60 P.2d 99 (1936); *Petersen v. Pilgrim Village,* 256 Wis. 621, 42 N.W.2d 273, 18 A.L.R.2d 206 (1950); 5B C.J.S. *Appeal and Error* § 1941 (1958). On remand, the court will not be required to guess at the outcome of the progress hearing heretofore scheduled for April 1972. The record of the juvenile court hearings in January 1969 can be made part of the record for the purpose of reaching a fully informed judgment. Expert witnesses can each testify, preferably in person concerning matters relevant to Sego's fitness and possible prospective permanent damage to the children, after each will have interviewed both the father,

the children, and the Johnsons, and ascertained the Johnsons' continued willingness to keep the children and do what their love of the children requires of them. We do not intend, by what we say here, to limit evidence otherwise admissible. Upon review of the totality of all pertinent facts at the conclusion of the remanded hearing, conclusions may be reached on the issue of permanent deprivation free of the difficulties we have discussed. In remanding this case for additional evidence, we do not mean to express any opinion on the final disposition of this case. *Daugherty v. Daugherty, supra. See* RCW 26.32.040 (1).

We make no change in the order of the trial court denying visitation rights to Mr. Sego. Pending the remanded hearing, the trial court is free to exercise its discretion on the matter of visitation. Upon the conclusion of the remanded hearing, the trial court will determine visitation rights based on its disposition of the matter of permanent deprivation.

The judgment is reversed with directions to hold further proceedings consistent with this opinion.

WILLIAMS and CALLOW, JJ., concur.

Petition for rehearing denied September 12, 1972.

Review granted by Supreme Court October 26, 1972.