IN RE INTEREST OF MICHAEL LEE WAGNER,
ANN SHERRY RUSSELL, JACK EDWARD RUSSELL, JR.,
AND MELVIN RAY RUSSELL,
CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V.
KAREN RUSSELL, NATURAL MOTHER, JACK E.
RUSSELL, SR., NATURAL FATHER, AND KEITH CAVES,
NATURAL FATHER, APPELLANTS.

305 N.W.2d 900

Filed May 22, 1981. No. 43616.

Thomas R. Wolff for appellants Russell.

Frederick D. Stehlik of Daub, Stehlik & Smith for appellant Caves.

Donald L. Knowles, Douglas County Attorney, and Christopher E. Kelly for appellee.

Heard before BOSLAUGH, MCCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

CLINTON, J.

This is an appeal from a judgment of the separate juvenile court of Douglas County, terminating the parental rights of Karen Russell and Jack E. Russell, Sr., husband and wife, and of Keith Caves. Four children

are involved: Michael Lee Wagner, Ann Sherry Russell, Jack Edward Russell, Jr., and Melvin Ray Russell. At the time the petition was filed on September 29, 1978, Michael was 4 years 6 months of age; Ann Sherry, 1 year 6 months; and Jack and Melvin, twins, were 4 months of age.

Karen is the mother of all four children. Jack is the father of Ann Sherry and the twins. Michael was born when Karen was 15 years of age and before her marriage to Jack. Keith Caves is the natural father of Michael Wagner.

The petition alleged that Karen and Jack were, through no fault of their own, unable to assume care, custody, and control of the children and that the children were without proper support under the provisions of Neb. Rev. Stat. § 43-202(1) (Reissue 1978). It further alleged that, by reason of certain specifically described acts or omissions of the parents, the children lacked proper parental care by reason of the faults or habits of the parents, all under the provisions of § 43-202(2).

As to Keith Caves, the petition alleged that Michael was homeless or destitute, or without proper support.

On October 2, 1978, the county attorney filed a motion for temporary custody, and on October 2, 1978, the court took custody and entered an order placing the possession of the children in the Douglas County Social Services for temporary placement in a foster home. Attorneys were appointed for all parties and hearings were held on October 16, 1978, January 30, 1979, April 11, 1979, September 7, 1979, April 8, 1980, May 13, 1980, and July 9, 1980.

On February 14, 1980, a motion for termination of parental rights was filed, which alleged, among other particulars, that Karen and Jack had failed to cooperate in a rehabilitation plan and that Caves was unable to provide habitation and support for Michael because he was then incarcerated in the Nebraska Penal and Correctional Complex for a term of several years.

Caves, pursuant to an order of the court, made ap-

pearances at the hearings of January 30, 1979, and April 8, 1980, and testified at the latter hearing. He also filed a resistance to the motion for termination.

On June 10, 1980, the court entered an order finding certain specific allegations of the petition to be true; that it was in the best interests of the children that parental rights be terminated; and that the children remain in the custody of the State of Nebraska, Department of Welfare (custody had been placed by a prior order), for adoptive purposes.

The Russells and Caves have separately appealed to this court.

Caves makes the following assignments of error: (1) The evidence does not show that he substantially, continuously, and repeatedly neglected his child and refused to give the child necessary parental care and protection. (2) The court erred in not directing and supervising for him a plan of rehabilitation as a parent. (3) The court erred in terminating his parental rights on the sole ground of his incarceration in the Nebraska Penal and Correctional Complex.

The sole assignment of error made by the Russells is that there exists in the record no clear and convincing evidence that they substantially or repeatedly neglected the children and refused to give the children necessary parental care and protection as required by Neb. Rev. Stat. § 43-209(2) (Reissue 1978).

We affirm.

With reference to Caves, the evidence is as follows. He admits paternity of Michael. However, the record does not show that he has acknowledged paternity in the form provided by statute, nor has there been any adjudication of the fact of paternity. No orders for support have ever been entered.

When Caves appeared before the court on January 30, 1979, he was 21 years of age. His exact date of birth is not shown. Michael was born in March of 1974. This would indicate that the child was conceived in June or July of 1973, at which time Caves was about 15 years of

age. Karen testified that Michael was conceived as a consequence of her being raped by Caves, but she gave no details or corroboration of this testimony other than what may be implied from Caves' testimony that he neither lived with nor dated Karen. He made no direct denial of the claim of rape and no inquiry was made of him on that point.

Caves began serving a 6- to 10-year term in the Nebraska Penal and Correctional Complex in April of 1977. During the approximately 3-year period after Michael's birth and before Caves' incarceration, he did not support the child, although he visited the baby on seven or eight occasions, and on one occasion, the first Christmas following his birth, made a gift of clothing. Karen testified that she did not want Caves' help and apparently detested him because of the manner in which she claims the child was conceived.

Caves' first visits with the child were made with Karen's consent, but later visits were made over her objection and without her knowledge through the cooperation of relatives of both Karen and Caves. Apparently the families were acquainted and lived in the same neighborhood.

The foregoing evidence, including Caves' incarceration, is sufficient to show that Caves neglected to and was incapable of carrying out his parental responsibilities during the 3 years previous to his incarceration. The fact of his later incarceration made it impossible for the court to direct and supervise a plan of "rehabilitating" Caves as a parent, even if it were required by law to do so. Where the juvenile court has made a finding of neglect under § 43-209(2), it need not afford the parent opportunity to correct the conditions underlying the finding before terminating parental rights. *State v. Duran*, 204 Neb. 546, 283 N.W.2d 382 (1979). Although a parent's parental rights should not be terminated for the sole reason of conviction of crime and incarceration, the fact of incarceration may be considered along with other factors in determining

whether parental rights should be terminated. *In re Sego*, 7 Wash. App. 457, 499 P.2d 881 (1972); *In re Welfare of Staat*, 287 Minn. 501, 178 N.W.2d 709 (1970).

Caves did not fulfill his parental responsibilities of support and maintenance. The familial relationship between him and Michael was almost totally absent. We say, in passing, that we have not purported to make any determination as to whether Michael was conceived as a consequence of a rape, and, hence, that factor is not considered in our conclusion. The best interests of the child require that the parental rights of Caves be terminated. See *Cox v. Hendricks*, 208 Neb. 23, 302 N.W.2d 35 (1981).

The child Michael apparently was in Karen's custody or that of Karen's mother until Karen's marriage to Jack, at which time Michael was about 2½ years old. He thereafter lived with Karen and Jack.

The evidence presented at the various hearings, if believed by the court, would permit it to find, by clear and convincing evidence, the following facts. The situation of Michael and the three Russell children first came to the attention of the Douglas County Child Protective Services in about May of 1978 as the result of a referral made by a nurse employed by a hospital in which Karen was a patient and from which she signed out against medical advice. This was at about the time of the birth of the twins. As a consequence of the referral, an investigation of the circumstances of the four children was made by a Child Protective Services social worker and a visiting nurse. Their testimony indicated that the children were not being properly fed and cared for and were being subjected to extremely unsanitary conditions hazardous to their health. It further indicated that Karen lacked the requisite knowledge and motivation to care for the children in a reasonably proper manner. The twins, apparently, were not growing at normal rates. The Child Protective Services arranged to have the twins examined at a clinic. It also arranged to have all the children cared for at a day-care center

while Karen worked or sought employment. Karen brought the children in the morning and picked them up in the evening. This type of care continued during a period of several months. During the entire period of time, the children arrived at the center unclean and always hungry. They had to be bathed by the center's staff as well as fed. Karen frequently failed to furnish sufficient formula for the twins, although it was available to her through Medicaid. One of the twins developed the disease called thrush. Karen was instructed by the visiting nurse to sanitize bottles and not interchange them between the twins. She failed to do so and the other twin caught the disease. Karen failed to secure refills of medication prescribed for the disease and the visiting nurse had to procure and deliver the medicine to the day-care center. During all this time, the visiting nurse conferred weekly or more frequently with Karen, offered advice, and gave training which went unheeded.

During the above period of time and thereafter until 1979, the family did not, except for a brief period, have a residence of its own. They moved from relative to relative and had about 10 different addresses from 1978 until the motion to terminate was filed in 1980. On August 22, 1978, the visiting nurse received a call from Jack's sister asking her to obtain formula for the twins. Shortly thereafter the visiting nurse received a call from Jack's mother indicating that Melvin was having difficulty in breathing. During the foregoing period the parents failed to keep some of the medical appointments that had been arranged for the children. Upon receiving the call, the nurse went to the day-care center, examined the child, and while she was there the child's breathing was interrupted. The doctor who had been seeing the children recommended immediate hospitalization of all the children and they were taken by ambulance to the hospital.

During this period, Jack and Karen were having marital difficulties and living apart part of the time,

and a divorce was pending. After the children were placed in the hospital, these proceedings were filed in the juvenile court and, after hearing, the court directed the children be placed in foster care. They remained in foster care from September 1978 until the order of termination was entered on June 10, 1980.

The evidence also indicated that Jack changed employment frequently, apparently on some occasions without cause. He also served a jail sentence for some offense during that period of time. Karen had been arrested for burglary and was likewise incarcerated for a short period during the same time Jack was in jail. During the time of common incarceration, the children were in the care of Jack's mother, the person who had informed the visiting nurse of the breathing problems of one of the twins.

The evidence also indicated that the parents used ADC money for purposes of bail and for the purchase of an automobile, when necessary transportation services would have been furnished by the Child Protective Services.

In order to assist Jack and Karen in becoming better parents, the court, on September 10, 1979, approved and ordered the implementation of a plan. This plan included, among other things, that Karen and Jack submit to psychological and psychiatric testing; pay $40 per month toward the support of the children while in foster care; attend training sessions designed to develop the knowledge, skills, and motivation required to carry out the obligations of parents to a reasonable degree; procure and maintain clean and adequate housing for the family; and Jack maintain employment.

On February 14, 1980, the county attorney filed the motion for termination of parental rights.

Either by stipulation or the introduction of evidence, the following facts were established. Jack and Karen completed the psychological testing and Karen completed the psychiatric testing. They made no financial contribution to the support of the children while they

were in foster care. Karen attended 8 of 23 parental sessions; Jack attended 6 of 15 such sessions. Karen regularly visited with the children; Jack did not visit the children after September 1979.

The evidence rather clearly indicated that Jack and Karen did not take seriously the possibility of losing their children until the motion for termination was filed. The psychological testing indicated that the parents had sufficient mental capability to carry out their parental obligations had they the proper motivation. It indicated, however, that they would have difficulty in maintaining regular employment.

Karen testified that the housing they proposed to use, furnished by her mother, had adequate space for only two children. The mother testified that they could have the housing "if they can keep it up."

Jack testified, when asked what his desires were with reference to the children: "A. Well, it's kind of hard to say, but I would just as soon have two because if you give us all four you are going to end up taking them because we couldn't financially support four kids. Q. Do you want the two children back? A. The two oldest ones, yes." He further testified: "I don't want them to terminate any rights, but I mean, if you are going to look at it realistically there's no way we can support four kids."

The evidence shows that all four children made great progress in health and mental growth while under foster care and their appearance and manner make them quite lovable.

While, to some extent, the court's findings are based upon somewhat conflicting evidence, we, on review de novo, take into consideration the fact that the trial judge observed the witnesses and is in a much better position than this court to draw conclusions concerning the capabilities and intentions of the parents.

The evidence was sufficient to establish clearly and convincingly that the parents had substantially and continuously neglected and refused to provide neces-

sary parental care and protection for the children, and that the best interests of the children would be served by terminating the parental relationship. *State v. Chant*, 202 Neb. 750, 277 N.W.2d 97 (1979).

AFFIRMED.