# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-CA-02106-SCT

*BARBARA ANN GUNTER AND ANTHONY HILL*

*v.*

*THERESA DAWN HILL GRAY*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/5/2001 |
| TRIAL JUDGE: | HON. STUART ROBINSON |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | MELISSA LEE DAY GARDNER |
| ATTORNEY FOR APPELLEE: | SHARON PATTERSON THIBODEAUX |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND REMANDED - 07/01/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1. The case before us involves the attempt by a mother to have the parental rights of a father, as to his two daughters, terminated. The basis of the complaint is the father's sordid, criminal conduct against the mother, a step-daughter from the mother's previous marriage, and society in general. No allegation is made of abuse or criminal conduct by the father against either of his two daughters. We believe an initial observation is appropriate.

¶2. One of the features of our free society which, at times, results in undesirable consequences, is the virtually unfettered right of our citizens -- qualified or not -- to bear children and raise them according to

the parents' value system, with almost no guidance or assistance.[1] Parents have the right to select the religious and moral training for their children, and they exert great influence on their children's thinking about such matters as violence, crime, prejudice and the like.

¶3. Because parental rights are so important, we sharply limit the circumstances under which can be terminated by the government. This Court, and the judiciary in general, sets forth the rules and criteria for a non-custodial parent's visitation with his or her children. We have the prerogative and, indeed, the obligation to deny a non-custodial parent any visitation rights or contact with his or her children whatsoever where, to do so, would be in the child's best interest. However, termination of parental rights is a different matter. The extinguishment of the substantive right to be regarded by our law as the legal parent of a child is wholly within the discretion of the Legislature. The only limit to that legislative prerogative lies within the Constitutions of the United States and the state of Mississippi.

¶4. This case exemplifies what the majority considers to be a legislative oversight. We find it difficult to accept that the Legislature, in its wisdom, would not conclude that the parental rights of Anthony Hill should be terminated. We hasten to state that, if we were allowed by law to terminate parental rights under the facts and circumstances of this case, we would do so. However, we are bound by the oath of office to follow the law. The law provides very specific grounds for termination of parental rights. Unfortunately, Anthony's conduct does not fit any of the grounds enumerated by the statute. We are not allowed to create law; we must follow the law given to us by the Legislature.

¶5. In that regard, we hereby call upon the Legislature to review the facts of this case and reexamine Miss. Code Ann. § 93-15-103. This Court would welcome an amendment to the statute which adds as

---

[1] Indeed, we consider raising our children to be a fundamental right, entitled to great protection. *Prince v. Massachusetts*, 321 U.S. 158, 64 S. Ct. 438, 88 L. Ed. 645 (1944).

grounds for termination of parental rights a series of abusive incidents involving a spouse[2] and/or children.[3] But unless and until the statute is amended, we must follow the statute as it currently exists.

## FACTS

¶6.     Theresa and Anthony Hill were divorced on November 5, 1997 on the ground of irreconcilable differences. Two daughters, were born during the marriage. At the time of the divorce, the parties entered into an agreement outlining the custodial arrangement, child support obligations and visitation rights of the parties. Pursuant to the agreement, the parties shared joint legal custody, and Theresa had primary physical custody. Anthony was ordered to pay $350.00 per month in child support and was granted standard visitation rights.

¶7.     The relationship between Theresa and Anthony quickly began to deteriorate. On August 12, 1998, the trial court dismissed competing contempt actions, but ordered a modification of the Final Judgment by designating a specific place for the exchange of the minor children for visitation purposes. The trial judge also ordered Anthony to cease his alleged harassment of Theresa and to submit to psychiatric evaluation and treatment.

¶8.     On December 2, 1999, the trial court again dismissed competing contempt actions, but lowered Anthony's child support obligation, and  entered a judgment against him for child support arrearage.

¶9.     During the period of time between the divorce and the trial on the merits in the case sub judice, Theresa filed criminal charges against Anthony on several occasions. On November 20, 1997, Anthony was found guilty of one count of simple assault against Theresa and one count of assault on Theresa's

---

[2]Where the abuse of the spouse took place in the presence of the child.

[3]The parent's children, step-children, or other children.

3

daughter from a previous marriage. A subsequent charge of simple assault was remanded to the files on December 9, 1997.

¶10. On April 19, 1998, Anthony was convicted of one count of simple assault against Theresa and on July 20, 1998, he was found guilty of stalking Theresa. Additionally, prior to Theresa's remarriage, Anthony was convicted of trespassing on the property of her then-boyfriend on two separate occasions.

¶11. In March, 1999, Anthony was found guilty of telephone harassment and was sentenced to two years in the custody of the Mississippi Department of Corrections. However, the sentence was suspended, and he was placed on supervised probation. As a condition of his probation, Anthony was ordered to have no contact with either Theresa or her new husband, except as in the manner and at the times permitted by the chancery court. Throughout this time, Anthony continued to exercise his visitation with his daughters on a regular and routine basis.

¶12. During February, 2000, Anthony violated his probation by telephoning Theresa, and on March 17, 2000, the trial court found Anthony guilty of a new charge of telephone harassment and revoked his suspended sentence and remanded him to the custody of the Mississippi Department of Corrections for two years.

¶13. Anthony and his mother, Barbara Ann Gunter, filed their petition requesting the Court to grant "grandparents visitation rights" to Barbara.

¶14. Theresa generally denied the allegations of Anthony's petition, and filed a counter-petition, requesting that Anthony's parental rights be terminated.

¶15. On January 20, 2001, the trial court appointed Kate S. Eidt as Guardian Ad Litem for the children, and instructed her to conduct and independent investigation. On June 11, 2001, Eidt issued her report finding that a "genuine and strong bond" existed between Anthony and his daughters. Eidt also found that

4

a relationship existed between the minor children and Barbara, and that Barbara would be in a position to assist and foster the relationship between Anthony and his daughters during his incarceration.

¶16.     On November 26, 2002, the trial court entered a judgment granting Theresa's counter-petition to terminate Anthony's parental rights and denying Barbara's petition for grandparent's visitation rights. It is from this judgment that Anthony and Barbara appeal.

## DISCUSSION

¶17.     On appeal, Anthony and Barbara raise three issues:

**I.      Whether the trial court erred in terminating the natural father's parental rights.**

**II.     Whether the trial court erred in denying grandparent visitation.**

**III.    Whether the trial court failed to issue findings of fact sufficient to support its ruling and failed to provide a reason for not adopting the recommendation of the Guardian Ad Litem.**

¶18.     On an appeal of termination of parental rights, the standard of review is limited. *S.N.C. v. J.R.D.*, 755 So. 2d 1077, 1080 (Miss. 2000). "The chancellor's findings of facts are viewed under the manifest error/substantial credible evidence test." *Id.* (citations omitted). This Court "ask[s] not how we would have decided the case ab initio but whether there be credible proof from which a rational trier of fact may have found abandonment by clear and convincing evidence." *Id.* (citation omitted).

¶19.     The reasons for which parental rights may be terminated are controlled by the Legislature. The courts have no right, authority or power to add to those reasons. Miss. Code Ann. § 93-15-103[4] states in pertinent part:

> (3) Grounds for termination of parental rights shall be based on one or more of the following factors:

---

[4]The version of this statute in effect at the time of the events of this case was enacted in 1998. Laws, 1998, ch. 516, Section 10.

(a) A parent has deserted without means of identification or abandoned a child as defined in Section 97-5-1,[5] or

(b) A parent has made no contact with a child under the age of three (3) for six (6) months or a child three (3) years of age or older for a period of one (1) year; or

(c) A parent has been responsible for a series of abusive incidents concerning one or more children; or

\* \* \*

(f) When there is an extreme and deep-seated antipathy by the child toward the parent or when there is some other substantial erosion of the relationship between the parent and child which was caused at least in part by the parent's serious neglect, abuse, prolonged and unreasonable absence, unreasonable failure to visit or communicate, or prolonged imprisonment; or

(g) When a parent has been convicted of any of the following offenses against his natural or adopted child: (i) rape of a child under the provisions of Section 97-3-65, (ii) sexual battery of a child under the provisions of Section 97-3-95(c), (iii) touching a child for lustful purposes under the provisions of Section 97-5-23, (iv) exploitation of a child under the provisions of Section 97-5-31, (v) felonious abuse or battery of a child under the provisions of Section 97-5-39(2), or (vi) carnal knowledge of a step or adopted child or a child of a cohabitating partner under the provisions of Section 97-5-41. . . .

In its judgment entered on November 26, 2002, the trial court held:

The Court finds that Mississippi law requires that the Court find by clear and convincing evidence that a party whose rights are sought to be terminated should be terminated. The Court further finds that the evidence in this case is not only clear and convincing, but overwhelming. Therefore, the Court finds, by clear and convincing evidence that the Petitioner, ANTHONY STEVE HILL, has failed and refused to pay his child support obligation, has failed to maintain a policy of medical insurance coverage in his minor children, and has failed to attempt to communicate with his minor children in one and one-half years, and therefore, the parental rights of the Petitioner, ANTHONY STEVE HILL, should be, and hereby are, terminated as to the minor children.

---

[5]Abandonment under Miss. Code Ann. § 97-5-1 makes it a crime to leave a child on the street, or elsewhere, with the intent to abandon it.

¶20. Anthony was incarcerated in February 2000, and the hearing regarding parental rights and grandparent visitation took place on November 5, 2001. The chancellor stated that Anthony had "failed to attempt to communicate with his minor children in one and one-half years."

¶21. Anthony contends that he did not abandon his children. This Court has defined abandonment as "any conduct by a parent which evinces a settled purpose to forego all duties and relinquish all parental claims to the child." *S.N.C.*, 755 So. 2d at 1081. "The test is an objective one: whether under the totality of the circumstances . . . the natural parent has manifested [his] severance of all ties with the child." *Id.*

¶22. The record demonstrates that Anthony has not been the ideal husband, ex-husband or parent. However, it fails to show that Anthony has abandoned the children. Through testimony, it was clearly demonstrated that Anthony exercised his visitation regularly and routinely until the time of his incarceration.

¶23. As to Anthony's relationship with the children, the Guardian Ad Litem stated:

> While I believe that it will be difficult, more likely impossible, to allow Teresa [sic] and Steve [Anthony] to ever have contact with each other in the future, I do find that there exists a genuine and strong bond between the girls for their Dad. They readily express their love for him and thus there exists a loving relationship between the three of them. Furthermore, this relationship has been verified by every person that I have interviewed, including Teresa [sic] Gray.

¶24. As part of Anthony's sentence, he was prohibited from making any contact with Thersa or her husband without court approval. Anthony contends that any attempts to contact the children, i.e., telephone calls or messages, would have resulted in contact with Theresa, thereby placing him at risk of additional charges and penalties. However, Theresa contends that Anthony was never ordered to refrain from communicating with his children. Theresa contends that any attempt at sending letters, birthday cards,

7

Christmas presents or contacting the children by telephone would not have required that he contact Theresa.

¶25. The Guardian Ad Litem reported that, following Anthony's imprisonment, Theresa did not allow the girls to visit with Gunter. Therefore, we find that Anthony's only realistic means of contacting the children would have been at Theresa's home, which placed Anthony at risk of contact with Theresa.

¶26. In recommending that Gunter be granted visitation rights during Anthony's incarceration, the Guardian Ad Litem stated:

> Mrs. Gunter suggested that if she were afforded to [sic] opportunity to have weekend visitation with the girls, then [Anthony] could call her and allow him to speak with the girls which would be a reasonable way to re-open communication between the girls and their father as long as there was no mention of their mother or her husband. The girls could also write to him and he could respond to them, but only at his mother's address and again as long as there was no mention of their mother or her husband.

¶27. It appears that the Guardian Ad Litem recognized the communication problems between Anthony and his children because of the potential contact with Theresa. However, the chancellor stated from the bench:

> Well, I'll have to say this. Every single witness' testimony I've heard has been overwhelming to the effect that Mr. Hill has totally failed to carry out his obligations to his children. He's refused to pay any child support. We heard that on the tape. He said he wasn't going to. He's obviously in contempt of court. But he also, according to the testimony that's been presented, has failed to try to communicate with them in any way since a year and a half ago. He's done nothing. It would appear to me - - and this is just speculation on my part - - that perhaps the driving force behind this may be his mother who was seeking grandparent visitation.
>
> But the law requires that the Court find by clear and convincing evidence that a party whose rights are sought to ne terminated should be terminated. In this case I think it was not only clear and convincing, but it was overwhelming. And this Court is obligated to look out for the best interests of the children. And I'm going to do my duty and declare his parental rights terminated.

¶28.    The chancellor made no mention regarding communication with the children other than Anthony had not communicated with them for a year and a half. In prohibiting Anthony from having any contact with Theresa, the chancellor made no provision for Anthony to contact his children under the circumstances. There was testimony that Anthony communicated and exercised his visitation rights up until the time of his incarceration. Furthermore, there was an effort on Anthony's part to have his mother granted visitation rights in which he would have been able to have contact with his children while she had them. Therefore, this Court finds that Anthony did not abandon his children once he was incarcerated.

¶29.    Theresa points out that this Court has held that "[i]mprisonment, and the resulting conditions, can be rightfully considered as a significant factor when determining whether rights may be terminated." *Vance v. Lincoln County Dept. of Pub. Welfare*, 582 So. 2d 414, 418 (Miss. 1991). In *Vance*, the parent argued that the trial "court erred in terminating her parental rights based solely on her incarceration." This Court concluded: "It is clear that the chancellor in this case considered [the parent's] potentially lengthy incarceration as one, albiet major, factor in his findings of substantial erosion. This issue is without merit." *Id.* While Theresa's observations concerning *Vance* are correct, her case is substantially different. In *Vance*, there was evidence that the relationship between the mother and her children had substantially eroded, and further evidence of indifference in the children's attitude toward their mother. Furthermore, the mother in *Vance* was sentenced to (54) years for murder and 30 years for armed robbery. These facts are quite different from this case.

¶30.    Theresa raises the fact that Anthony was convicted of simple assault against her minor daughter from a previous marriage. His step-daughter testified at trial regarding abuse:

> Q. Okay. . . ., let me ask you. From time to time when he got violent, would he ever get violent at you?

A. Occasionally, yes.

Q. Okay. And what did that amount to, please?

A. If I had done something wrong, he would hit me. I mean spank me.

Q. Like spanking or something, like fuss and swat your butt.

A. Uh-huh. He's never been abusive, like hitting me.
. . .

Q. Tracy, when Mr. Folse was questioning you, you said that he never hit you. Are you saying he never hit you in punishment?

A. Whenever I did something bad. This is prior to all the abuse that happened.

Q. All right. So there were later instances when he actually struck you.

A. He struck me on my face. But he was trying to hit my mom, but he had missed, because I was trying to pull him off my mom.

¶31. This testimony clearly sets forth that Theresa failed to prove by clear and convincing evidence that Anthony engaged in a series of abuse against Tracy. Furthermore, there were allegation of Anthony touching or attempting to touch Tracy in an inappropriate manner. If this is true, then charges should have been brought and, if proven, Anthony, should have been dealt with appropriately. However, no charges were filed against Anthony. Even if charges had been brought, and Anthony had been convicted, the statute in effect at the time would not have allowed termination of parental rights for Anthony's behavior toward a step-daughter, and the statute covered only natural and adopted children.[6]

¶32. Theresa argues that Anthony's violence toward others meets the requirements of § 93-15-103(3)(c). She states that a parent who "has been responsible for a series of abusive incidents concerning one or more children" supports the termination of his rights because the abusiveness, violent rages and

---

[6]The statute has since been amended to include as grounds for termination of parental rights the conviction for certain enumerated sexual behavior against any child.

uncontrolled temper *affected* the children. There was testimony that during his rages, the children were frightened, scared, cry and yell for him to stop. There was also testimony, however, that the abuse was never directed towards Anthony's children.

¶33. It is very tragic and disturbing that these children have been exposed to abuse directed toward their mother. However, as stated earlier, it is within the exclusive prerogative of the Legislature to determine the circumstances which merit termination of parental rights. Anthony's conduct does not meet the "series of abusive incidents" as required by § 93-15-103(3).

¶34. Theresa testified that her specific reason for requesting a termination of Anthony's parental rights was:

> I cannot feel comfortable with [our daughters] seeing this man. I am terrified of what he may do later on or now. His drinking, his abusiveness towards woman, his rage, his hatred. I don't want them to witness that. I want them to grow up normal. I want them to be okay. And I don't think they can be okay visiting with this man. I don't want them to be psychologically scarred. And I especially don't want them to be given beers, cigarettes or fondled.

¶35. We think Theresa's words are commendable and full of wisdom. However, fear of what Anthony may do later is not grounds for termination of parental rights pursuant to § 93-15-103. We hasten to again point out that the matter before us involves the question of whether parental rights may be terminated. We do not here address in any manner the question of whether, and under what conditions, Anthony may visit with the children.

¶36. We find that Theresa did not present clear and convincing evidence which would justify termination of parental rights as provided by § 93-15-103.

11

¶37. Since this Court holds that the trial court erred in terminating the parental rights, the issue of grandparent visitation is moot. Therefore, we will not address that issue; however, a discussion regarding the Guardian Ad Litem's report and recommendation is warranted.

> **II.  Whether the trial court failed to issue findings of fact sufficient to support its ruling and failed to provide a reason for not adopting the recommendation of the Guardian Ad Litem.**

¶38. Anthony points out that the trial court failed to make a finding on the record of the reasons for not adopting the recommendation of the Guardian Ad Litem. Theresa contends that the guardian ad litem's view is only additional information to aid the chancellor in making the decision on the merits of the matter in dispute, a decision which ultimately lies with the chancellor. Theresa further contends that the chancellor, as fact-finder, should consider the evidence presented by the guardian ad litem, as well as all other relevant evidence. While this may be correct, this Court has held:

> [T]he proper function or role of a guardian ad litem as one who 'investigates, makes recommendations to a court, or enters reports' and is 'a representative of the court appointed to assist it in properly protecting the interests of an incompetent person.

*S.N.C.*, 755 So. 2d at 1082 (citations omitted). Furthermore, this Court held:

> that a chancellor **shall include** at least a summary review of the qualifications and recommendations of the guardian as litem in the court's findings of fact and conclusions of law. Further, we hold that when a chancellor's ruling is contrary to the recommendation of a statutorily required guardian ad litem, the reasons for not adopting the guardian as litem's recommendation **shall be stated** by the court in the findings of fact and conclusions of law.

*Id.* (emphasis added). Miss. Code Ann. § 93-15-107 (Supp. 2003) states in pertinent part: "A guardian ad litem shall be appointed to protect the interest of the child in the termination of parental rights." Therefore, since the appointment of the guardian ad litem was mandatory in the case sub judice, the chancellor erred by failing to state the reasons for not adopting the guardian as litem's recommendation.

## CONCLUSION

¶39.    The chancellor erred in terminating Anthony's parental rights and in failing to state the reasons for not adopting the guardian ad litem's recommendation.  Therefore, we reverse the chancellor's judgment, and we remand this case for further proceedings consistent with this opinion.

¶40.    **REVERSED AND REMANDED.**

**SMITH, C.J., COBB, P.J., AND GRAVES, J., CONCUR.  WALLER, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION.  JOINED BY CARLSON AND RANDOLPH, JJ., DIAZ AND EASLEY, JJ., NOT PARTICIPATING.**

**WALLER, PRESIDING JUSTICE, DISSENTING:**

¶41.    I respectfully dissent from the majority's finding that termination of Anthony's parental rights is not appropriate.  Anthony's intentionally destructive and criminal conduct convinces me that the learned chancellor's finding that Anthony was an unfit father was correct.

¶42.    The record shows that Anthony is guilty of two separate counts of simple assault against his ex-wife Theresa; one count of simple assault against Theresa's minor daughter; one count of stalking Theresa, two separate counts of trespass, and two separate counts of telephone harassment against Theresa.  Anthony was physically and mentally abusive towards Theresa and "during his rages, the children were frightened, scared, [and cried and yelled] for him to stop."  But the majority minimizes this behavior because "the abuse was never directed towards Anthony's children."

¶43.    However, Anthony's uncontrolled rages and habitual criminal conduct toward the children's mother has created an atmosphere in which the children cannot help but be negatively affected. Whether Anthony has physically abused the children should be irrelevant where the children cannot be shielded from his

13

emotional abuse. He has shown no signs of remorse for his behavior, and even though he has presumably completed court-ordered therapy, his relentless battle against authorities and his ex-wife have continued.

¶44. Finally, the record shows that Anthony has "refused" to pay court-ordered child support. The only evidence which reflects positively on Anthony is that he seems to have a loving relationship with his two daughters. However, this evidence is vastly overshadowed by his criminal and destructive conduct.

¶45. The evidence clearly supports the chancellor's termination of Anthony's parental rights. Accordingly, I would affirm the chancellor's judgment.

**CARLSON AND RANDOLPH, JJ., JOIN THIS OPINION.**