LEE, P.J.,
 

 for the Court:
 

 PROCEDURAL HISTORY
 

 ¶ 1. An order granting emergency temporary custody of J.J.’s son, C.J.
 
 [1]
 
 , was granted to Ann and Bill Smith in the Chancery Court of Forrest County. The Smiths claimed that they were concerned about J.J.’s mental stability, and they requested that J.J.’s parental rights be terminated. They also sought to adopt C.J. J.J. objected and requested that the child be returned to her custody.
 

 ¶ 2. A guardian ad litem (GAL) was appointed. C.J.’s biological father was giv
 
 *1272
 
 en notice of the hearing, but he did not respond. Evidence was presented that he had never acted as a father to the child, and the chancellor terminated his parental rights. The chancellor also found that it was in the best interest of the child to terminate J.J.’s parental rights.
 

 ¶ 3. J.J. now appeals, asserting the following issues: (1) the chancellor erred in finding there was clear and convincing evidence to terminate her parental rights; (2) the chancellor erred by failing to summarize the qualifications and report of the GAL and by failing to state why he did not follow the recommendations of the GAL; and (3) the chancellor erred in relying on the GAL’s report because it did not include a full investigation. We will limit our discussion to issue one, as we find it dispositive. Finding error, we reverse and render the decision of the chancellor terminating J-J.’s parental rights. We remand this case to the chancellor for a determination of custody and visitation. The portion of the chancellor’s order terminating the father’s parental rights was not appealed and, therefore, remains unaltered by this Court’s opinion.
 

 FACTS
 

 ¶ 4. J.J.’s son, C.J., was eleven years old at the time of the hearing to terminate J.J.’s parental rights. C.J. was born sixteen-weeks premature in 1996 and is described as a special-needs child. C.J. has a hearing impairment and attends a school which specializes in hearing and language disorders. He was enrolled in this school by J.J. while he was under her care. J.J. drove him to school and picked him up daily. The school administrators’ main concern while C.J. was under J.J.’s care was excessive tardies. The tardies continued after C.J. went to live with the Smiths. The school administrators were also
 
 concerned
 
 that C.J. did not have cochlear implants. C.J. wore hearing aids, and his teachers emphasized the importance of him wearing them constantly.
 

 ¶ 5. Testimony was presented that J.J. did not make C.J. wear the hearing aids at all times while in her care. C.J. saw an audiologist in 2003, and J.J. was given information about cochlear implants. J.J. testified that she was concerned about the procedure because he had been under anesthesia numerous times, and she feared the procedure could be harmful.
 

 ¶ 6. For nearly two years prior to the hearing, C.J. resided with the Smiths and had no contact with J.J. Ann Smith (Ann) is J.J.’s niece and C.J.’s cousin. Ann testified that she and J.J. were practically raised as sisters because of their closeness in age. After the emergency custody order was granted, Ann had the cochlear implants implanted into C.J.’s ears. The school officials who testified stated that they saw an improvement in C.J.’s progress since he had been in the Smiths’ care. Ann instructed the school not to give any information about C.J. to J.J. if she attempted to contact the school. J.J. testified that her family would not let her see C.J. However, family members testified that they have never stopped her from seeing C.J., and J.J.’s older son goes to the Smiths’ house on occasion to visit C.J.
 

 ¶ 7. According to Ann, C.J.’s primary caretaker while he lived with J.J. was his sister, who was approximately ten years older than him. He referred to her as “Mama,” and he referred to J.J. by her first name. The sister passed away in 2005.
 

 ¶ 8. J.J. was diagnosed with bipolar disorder in 1994. She began receiving social
 
 *1273
 
 security benefits based on that diagnosis in 2003. She has undergone treatment and has been involuntarily committed to mental hospitals on at least three occasions. At the time of the hearing, she was receiving treatment at Pine Belt Mental Healthcare Resources. Her caseworker testified that from her observations, J.J. was capable of caring for C.J. as long as she was taking her medication.
 

 STANDARD OF REVIEW
 

 ¶ 9. “The chancellor’s findings of fact are viewed under the manifest error/substantial credible evidence test.”
 
 S.N.C. v. J.R.D., Jr.,
 
 755 So.2d 1077, 1080 (¶ 7) (Miss.2000) (quoting Vance
 
 v. Lincoln County Dep’t of Pub. Welfare,
 
 582 So.2d 414, 417 (Miss.1991)). As long as there is credible evidence to support the chancellor’s findings of fact, we must affirm the decision.
 
 K.D.F. v. J.L.H.,
 
 933 So.2d 971, 976-77 (¶ 20) (Miss.2006).
 

 DISCUSSION
 

 ¶ 10. J.J. argues that the chancellor erred in terminating her parental rights. The Smiths filed no brief in response. When the appellee fails to file a brief, we have two options:
 

 The first alternative is to take the appel-lees’ failure to file a brief as a confession of error and reverse. This should be done when the record is complicated or of large volume and “the case has been thoroughly briefed by the appellant with apt and applicable citation of authority so that the brief makes out an apparent case of error.” The second alternative is to disregard the appellees’ error and affirm. This alternative should be used when the record can be conveniently examined and such examination reveals a “sound and unmistakable basis or ground upon which the judgment may be safely affirmed.”
 

 Miller v. Pannell,
 
 815 So.2d 1117, 1119 (¶ 7) (Miss.2002) (internal citations omitted). The record in this case is not complicated or of large volume. Upon examination of the record, this Couit cannot find a sound and unmistakable basis upon which the judgment can be safely affirmed. For the reasons to be discussed, we find that insufficient evidence was presented to terminate J. J.’s parental rights.
 

 ¶ 11. In order to terminate parental rights, the chancellor must find “by clear and convincing proof that the parent or parents are within the grounds requiring termination of parental rights.... ” Miss. Code Ann. § 93-15-109 (Rev.2004). Mississippi Code Annotated section 93-15-103(3) (Rev.2004) contains a list of factors on which parental rights may be terminated. The chancellor considered the following factors from section 93-15-103(3) in terminating J.J.’s parental rights:
 

 (b) A parent has made no contact with a child ... three (3) years of age or older for a period of one (1) year; or
 

 (c) A parent has been responsible for a series of abusive incidents concerning one or more children; or
 

 [[Image here]]
 

 (e) The parent exhibits ongoing behavior which would make it impossible to return the child to the parent’s care and custody:
 

 [[Image here]]
 

 (i) Because the parent has a diagnosable condition unlikely to change within a reasonable time such as alcohol or drug addiction, severe mental deficiencies or mental illness, or extreme physical incapacitation, which condi
 
 *1274
 
 tion makes the parent unable to assume minimally, acceptable care of the child;
 

 [[Image here]]
 

 (f) When there is an extreme and deep-seated antipathy by the child toward the parent or when there is some other substantial erosion of the relationship between the parent and child which was caused at least in part by the parent’s serious neglect, abuse, prolonged and unreasonable absence, unreasonable failure to visit or communicate, or prolonged imprisonment....
 

 The chancellor also considered Mississippi Code Annotated section 93-17-7 (Rev. 2004), which discusses causes for termination of an unfit parent’s parental rights.
 

 ¶ 12. At the hearing, the Smiths alleged that J.J. had a diagnosable condition unlikely to change which made her unable to assume acceptable care of C.J. The following witnesses testified for the Smiths: Olivia Farish, an instructor at C.J.’s school; Jennifer Jenkins (Jennifer), Ann’s aunt and J.J.’s sister; and Nicole Jenkins (Nicole), Ann’s mother. The Smiths also testified, and J.J. was called as an adverse witness.
 

 ¶ 13. Farish testified that she had been C.J.’s teacher for nearly two years. She testified that C.J. was doing very well in school. She expressed concern that C.J. did not receive cochlear implants at a young age. Farish testified that children should wear the highest-level technology in hearing aids possible, which was cochlear implants. She stated that: “The amplification should be put on in the morning, worn all day, and other than taking a bath and going to sleep, then the amplification should be worn, and that’s critical to letting the child develop the language and the speech skills 24 hours a day....” She went on to testify that “the rule of thumb with deaf education is that you get the best amplification as soon as possible, that the better the amplification, the better progress the child is going to make.” Also, it is best to make use of the amplification “as soon as possible because you want to take maximum advantage of those earlier learning years.” Regarding the excessive tardies, Farish testified that for the 2005-06 school year, C.J. was tardy thirty-five times. Farish testified that:
 

 All children need to be in school the maximum amount of time, but for a hearing-impaired child ... it makes a difference in their outcome for life because you are not just teaching academics in a book. You are trying to equip the child with the social skills to speak and communicate.... [I]t is critical that he have as much time in the class as possible....
 

 ¶ 14. Finally, Farish testified that in August 2006, the staff at the school became concerned because C.J. came to school without his hearing aids or notebook, which was specially made for him by his teachers. A school official spoke with Jennifer, who told the school representative that she was unable to find them. Jennifer stated that C.J. was temporarily living with her because J.J. was not doing well. Around the same time, the school was notified that C.J. was having behavioral problems at home. Farish testified that she did not see these behavioral issues at school. In late August or early September 2006, J.J. began providing transportation again for C.J. to and from school. On September 18, 2006, the school received an e-mail from Jennifer notifying them that J.J. had dropped C.J. off at her house, and she had not seen J.J. since then. Farish
 
 *1275
 
 attempted to contact J.J. to confirm this information, but she was unsuccessful. Farish testified that after C.J. moved in with the Smiths, Ann requested a meeting with Farish to discuss what she could do at home to help C.J. Farish stated that since that time, C.J.’s language skills had expanded, and it was clear that he was learning at home.
 

 ¶ 15. Jennifer testified that at one point before the Smiths had custody of C.J., J.J. dropped him off with Jennifer and her mother and disappeared for approximately six months. It was at that point that the family sought to provide a more stable environment for C.J., and he went to live with the Smiths. Jennifer stated that she believed C.J. was happy and in a stable environment.
 

 ¶ 16. Nicole testified that when J.J. took her medication, she could take care of herself. However, she testified that J.J. “goes through periods where she won’t take [the medicine], and then she starts getting manic or starts — everything speeds up, her thought processes, her speech and everything, and she eventually starts getting psychotic, and then she actually has breaks with reality.” She testified that on one occasion, C.J. was dropped off at her mother’s house wearing clothes that were wet and several sizes too small. She testified that J.J. could not be found. J.J. testified that she had no recollection of dropping C.J. off wearing wet clothes or clothes that were too small. Nicole believes that C.J. is “a totally different child” since he began living with the Smiths. She stated: “When he was with J.J., he was a one-man train wreck.” Nicole testified that she could only recall one reference C.J. made to J.J. over the last two years. She stated that she felt it would be “detrimental” for C.J. to be reunited with J.J.
 

 ¶ 17. Steve Headrick, the GAL, testified that the Smiths were providing a better, more “language-rich environment” for C.J. Headrick testified that he did not have “any question [J.J.] is a good, loving mother and decent person.” He testified that his concerns were “things beyond what [J.J.] is really able to control herself because of the recurring stuff that — mentally that has apparently gone on for like 15 years or so and it — it may just be beyond her control[.]” Headrick agreed that C.J. should remain with the Smiths on a custodial basis. When asked about his recommendation regarding the termination of parental rights, Headrick responded:
 

 This is a — such a tough situation because, again, of [C.J.]’s special needs.... Now, it is a significant leap to terminate parental rights, as we as attorneys know. I have heal’d enough today about the consistency of the condition of [J.J.] that may well indicate that. I’m not — I’m evidently not quite prepared to make that leap, but probably enough evidence is here that the Court might could find that way, but that is such a condition and so consistent that it may well call for termination of parental rights.
 

 ¶ 18. In September 2008, the chancellor entered an order allowing the record to be reopened for the GAL to make additional findings after the death of C.J.’s half-brother, who was killed in an automobile accident. The Smiths requested that the record be reopened to evaluate any changes in J.J.’s mental health and stability since the death of her son. Headrick found that J.J. only complained of occasional depressive symptoms and trouble sleeping. Her mental-status examination revealed nothing negative. J.J. was working approximately thirty hours a week at a
 
 *1276
 
 grocery store and pursuing a degree from a vocational technology school. She told Headrick that she was taking three prescriptions and was properly following the dosing instructions. Headrick also spoke with Ann, who told him that C.J. “went to pieces” over fear he would see J.J. at his half-brother’s funeral. Ann stated that C.J. was afraid he would have to stay with J.J. and would not be able to continue living with Ann and her husband. Head-rick also questioned Ann about their recent filing for bankruptcy, and she replied that it had not affected their ability to provide for C.J.
 

 ¶ 19. After taking the testimony into consideration, the chancellor found that:
 

 The evidence would reflect that, when not in the thrall of her disability (which controls her behavior when she voluntarily abandons medication or treatment regimen), she is a loving, caring mother, somewhat capable of performing [sic] the responsibilities of a normal child, but still lacking the ability to deal with this special child.
 

 The chancellor noted that J.J. had not purposefully relinquished her parental rights nor had she abandoned the child by intentionally failing to see him for more than a year.
 

 ¶ 20. We agree with the chancellor that J.J.’s mental illness has affected her ability to care for her child. However, we cannot find that clear and convincing evidence was presented to prove that J.J.’s condition made her “unable to assume minimally, acceptable care of the child.” Miss. Code Ann. § 93-15-103(3)(e)(i). J.J.’s psychiatric reports dated August 2007 to September 2008 state that she suffered from bipolar disorder, occasional depressive symptoms, and has trouble sleeping. However, the reports consistently indicate that her insight and judgment were good; her attitude was cooperative; and her motivation for ongoing treatment was good. The reports also indicate that her bipolar disorder was being controlled by medication. Emmie Brunner, J.J.’s caseworker, testified that there were times in the past where J.J. had not been compliant with her treatment, but more recently, she had complied and attended all of her scheduled appointments.
 

 ¶ 21. Unless it is proven otherwise, it is presumed that the best interest of the child will be served by remaining with his or her parents. Carter
 
 v. Taylor,
 
 611 So.2d 874, 876 (Miss.1992). While allowing custody of C.J. to be returned to J.J. may be unsuitable because of her mental condition, we find that terminating J.J.’s parental rights was not supported by the evidence. The testimony showed that while on her medication, J.J. is a loving and caring parent. The testimony also showed that she has made improved efforts toward her recovery, and she has made attempts to stay in contact with C.J., such as calling and sending gifts. Further, the GAL was unsure in his assessment of whether to terminate parental rights. Ultimately, the GAL stated that he was “evidently not quite prepared to make that leap” to recommend terminating parental rights.
 

 ¶ 22. Based on the testimony, we find that consideration of permanent alternatives to terminating J.J.’s parental rights would have been appropriate. We find this case analogous to
 
 In re V.M.S.,
 
 938 So.2d 829, 837 (¶ 17) (Miss.2006). In
 
 In re V.M.S.,
 
 the supreme court found that termination of a mother’s parental rights was not supported by the evidence where the mother had a history of drug abuse and
 
 *1277
 
 bipolar disorder, but she was attempting to stay in contact with the child and making an effort at rehabilitation.
 
 Id.
 

 ¶ 23. Therefore, we reverse and render the chancellor’s judgment as to the termination of J.J.’s parental rights. We also remand this case for a determination of child custody and visitation. However, as stated by the supreme court in
 
 In re V.M.S.:
 
 “Notwithstanding our remand for this purpose, we in no way make any inference as to the appropriate decision concerning visitation.”
 
 Id.
 
 at 837 (¶ 19). Decisions regarding custody and visitation are appropriately left to the chancellor.
 
 Id.
 
 The portion of the judgment terminating the father’s parental rights remains unaltered by this Court’s opinion.
 

 ¶ 24. THE JUDGMENT OF THE FORREST COUNTY CHANCERY COURT TERMINATING THE NATURAL MOTHER’S PARENTAL RIGHTS IS REVERSED AND RENDERED, AND THIS CASE IS REMANDED FOR A DETERMINATION OF CHILD CUSTODY AND VISITATION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEES.
 

 KING, C.J., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. MYERS, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.
 

 [1]
 

 . In order to protect the identity of the minor child, the child's name and names of family members have been substituted with initials or fictitious names.