582 So.2d 414 (1991)
Jacqueline VANCE
v.
LINCOLN COUNTY DEPARTMENT OF PUBLIC WELFARE, by Walter F. WEATHERS, Social Services Area Director, and D.W., and C.T., Minors, by and Through Their Next Friend, Walter F. Weathers.
No. 89-CA-1173.
Supreme Court of Mississippi.
June 5, 1991.
*415 Vivian Brown-Toussaint, Natchez, Deborah A. McDonald, McComb, for appellant.
Mike C. Moore, Atty. Gen., Jackson, Patricia B. Marshall, J.D. Woodcock, Cassandra D. Burney, Sp. Asst. Attys. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, C.J., and PITTMAN and BANKS, JJ.
PITTMAN, Justice, for the Court:
The Lincoln County Department of Public Welfare, now known as the Lincoln County Department of Human Services, petitioned in Lincoln County Chancery Court to terminate the parental rights of Jacqueline Vance as to two of her children, D.W. and C.T. After making the requisite findings under Miss. Code Ann. § 93-15-103 (Supp. 1987), the chancery court terminated Jacqueline Vance's parental rights as to *416 D.W. and C.T. Jacqueline Vance appeals, alleging errors concerning the evidentiary support for the lower court's finding, as well as the constitutional viability of § 93-15-103. We find these allegations meritless and affirm.

I.
Jacqueline Vance is the mother of three children: D.W., born June 16, 1975, fourteen years old at the time of the hearing in this cause; C.T., born December 21, 1981, seven years old at that time; and Candace Andrenette Vance, born January 17, 1985. Candace lives with her aunt in Illinois. She is not under the jurisdiction of this state's department of human services and Jacqueline's parental rights as to her are not a subject of this appeal.
In July 1984, Jacqueline, D.W. and C.T. were living in Chicago. At that time Jacqueline was arrested and charged with murder and armed robbery. Jacqueline sent D.W. and C.T. to Lincoln County, Mississippi to stay with Bertha Collins, who had been Jacqueline's foster mother when she was younger. Eventually, in October 1984, because of ill health and financial problems, Mrs. Collins handed over custody of D.W. and C.T. to the Lincoln County Welfare Department. The children then lived with various relatives, including John Wall, Jacqueline's brother; Kathy Blue, Jacqueline's cousin; and Rickey Vance, Jacqueline's brother. None of these arrangements worked out for very long, and Rickey Vance eventually handed the children back to the Welfare Department. The children were placed back with Bertha Collins, where they remained until Mrs. Collins suffered a stroke. They then lived with a series of foster parents. D.W. eventually ended up back with Mrs. Collins and her husband. Because of C.T.'s behavior problems, she was placed in a therapeutic foster home. Foster parents in these homes had received specialized training in dealing with children with behavior problems.
Jacqueline Vance was eventually convicted on both charges and was sentenced to fifty-four (54) years on the charge of murder and thirty (30) years on the charge of armed robbery, with the sentences to run concurrently. She was incarcerated in the Dwight Correctional Center on or about April 24, 1985. While at Dwight she was convicted of aggravated battery of a correctional officer, and had two years added to her sentence. She has appealed her criminal convictions. Her earliest possible parole date, in the event of an unsuccessful appeal, is not clear from the record.
On April 6, 1988, the Lincoln County Department of Public Welfare filed a Petition to Terminate Parental Rights, alleging that it had had custody of D.W. and C.T. for over one year, and had attempted to place them with relatives or foster homes on a long-term basis during that time, but had been unable to do so. The petition further alleged that Jacqueline Vance had asked that the children be placed with the Illinois Department of Children and Family Services, but this agency had refused to take the children. The petition finally alleged that there had been a substantial erosion of the relationship between Jacqueline and the children, such that her parental rights should be terminated pursuant to Miss. Code Ann. § 93-15-103(3)(e) (Supp. 1987). The putative fathers of D.W. and C.T. both executed releases as to any parental rights they might have had. A guardian ad litem was appointed to represent D.W. and C.T. After a hearing, the lower court found that a substantial erosion of the relationship between the children and Jacqueline had been shown by clear and convincing evidence. Jacqueline Vance's parental rights as to D.W. and C.T. were terminated. The court also rejected constitutional challenges to § 93-15-103.

II.
The applicable statute Miss. Code Ann. § 93-15-103 (Supp. 1987) provides in part:
(1) When a child has been removed from the home of its natural parents and cannot be returned to the home of his natural parents within a reasonable length of time because returning to the home would be damaging to the child or the parent is unable or unwilling to care for the child, and when adoption is in the *417 best interest of the child, taking into account whether the adoption is needed to secure a stable placement for the child and the strength of the child's bonds to his natural parents and the effect of future contact between them, the grounds listed in subsections (2) and (3) of this section shall be considered as grounds for the termination of parental rights. The grounds may apply singly or in combination in any given case.
(2) The rights of a parent with reference to a child, including parental rights to control or withhold consent to an adoption, and the right to receive notice of a hearing on a petition for adoption, may be relinquished and the relationship of the parent and child terminated by the execution of a written voluntary release, signed by the parent, regardless of the age of the parent.
(3) Grounds for termination of parental rights shall be based on one or more of the following factors:
... .
(e) When there is an extreme and deepseated antipathy by the child toward the parent or when there is some other substantial erosion of the relationship between the parent and child which was caused at least in part by the parent's serious neglect, abuse, prolonged and unreasonable absence, unreasonable failure to visit or communicate, or prolonged imprisonment.
(4) Legal custody and guardianship by persons other than the parent as well as other permanent alternatives which end the supervision by the department of public welfare should be considered as alternatives to the termination of parental rights, and these alternatives should be selected when, in the best interest of the child, parental contacts are desirable and it is possible to secure such placement without termination of parental rights.
The burden of proof in such a case is by clear and convincing evidence. Miss. Code Ann. § 93-15-109 (Supp. 1987); Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). The chancellor's findings of fact are viewed under the manifest error/substantial credible evidence test. Bryant v. Cameron, 473 So.2d 174, 179 (Miss. 1985); Veselits v. Cruthirds, 548 So.2d 1312, 1316 (Miss. 1989). Once the clear and convincing burden has been met, the best interest of the child is to be considered. Petit v. Holifield, 443 So.2d 874, 877 (Miss. 1984). This Court has not been reluctant to reverse the lower court when the required burden of proof has not been met. See Petit; De La Oliva v. Lowndes County Department of Public Welfare, 423 So.2d 1328 (Miss. 1982).
Jacqueline Vance argues that the Welfare Department did not meet its burden in this case, and that the lower court erred in finding that it had. Jacqueline Vance's right to raise her children is of a fundamental nature and is entitled to great protection. Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944). However, these parental rights may be abridged when the welfare of the children is threatened. Prince, 321 U.S. at 166-67, 64 S.Ct. at 442, 88 L.Ed. at 652. This Court provided, in Adams v. Powe, 469 So.2d 76, 78-79 (Miss. 1985), the following:
Although aware of the great responsibility placed upon any court when determining whether a parent's fundamental right to rear their offspring should be terminated, we think we would be remiss in our duties if we did not terminate the parental rights to safeguard the childrens' greater right to food, shelter, and opportunity to become useful citizens.
Byrd Storey and Liz Polk, two Lincoln County social workers, testified as to the nature of the relationship between Jacqueline Vance and her children. Storey's testimony supported a finding of substantial erosion, but she had not been the actual social worker for the children for some time. Liz Polk had been the children's social worker since April 1986. Her testimony seemed to show indifference at best on the part of the children toward Jacqueline, and on C.T.'s part there was practically no relationship. She also testified that the children were doing well in foster care despite their uncertain future. Dr. Gerald *418 O'Brian, a psychologist, concurred in this opinion. O'Brian reviewed case summaries on both children, prepared by Liz Polk, along with a psychological evaluation of C.T. He had also interviewed each child twice. He recommended a secure, stable home environment for both children, with continued therapy for C.T.
On the other hand, Jacqueline Vance testified that her relationship with her children had been a good one despite the obvious constraints, that she had relatives who were willing to take the children, and that decreasing contact between her and her children had often been the result of interference by the Welfare Department. Bertha Collins stated that the children knew their mother, that they wrote to her and talked to her over the phone without major problems, and that Jacqueline had sent money and gifts to her for the children.
The most convincing testimony on this point is that of D.W. and C.T.D.W. had not seen his mother for five years. He wrote to her and talked with her on the phone. He seemed indifferent to the possibility that his mother's parental rights might be terminated. He also seemed anxious to be adopted by someone. The thought of returning to Chicago was frightening to him, as were his memories of what his mother had done. The murder and robbery for which Jacqueline Vance had been incarcerated had occurred in the apartment in which the children were living. D.W. and C.T. had not been in the apartment when the murder and robbery had occurred, but they had been out on the back porch, and D.W. had heard the shots and had seen blood on the apartment floor. D.W. also testified that Jacqueline had used and sold drugs, and had given him drugs when they lived in Chicago. Jacqueline denied this.
C.T. seemed to have no memory of her mother, as she was two when she was brought back to Mississippi. She had to be forced to talk on the phone with her and to write to her. Both children stated that they loved Jacqueline because she was their mother, although D.W. qualified this by saying that it wasn't something he felt he was supposed to do.
We have in the case sub judice the erosion of a bad relationship to one that is practically non-existent. Based on a review of the entire record, we cannot say that the lower court's finding of a substantial erosion was manifestly wrong in this case. Indeed, under the circumstances it appears that no viable alternative to termination was available. We have conduct of Jacqueline Vance, the consequence of which is tantamount to an abandonment. Though not raised by the pleadings, the record also supports a finding of serious neglect by Jacqueline Vance on behalf of these children.
Jacqueline Vance further argues that the lower court erred in terminating her parental rights based solely on her incarceration. Both parties rely on a number of cases which state that incarceration or imprisonment of a parent is not sufficient reason per se to terminate parental rights. Imprisonment, and the resulting conditions, can be rightfully considered as a significant factor when determining whether rights may be terminated. See In re Clark, 26 Wash. App. 832, 611 P.2d 1343 (1980); Juan A---- v. Dallas County Child Welfare, 726 S.W.2d 241 (Tex. Ct. App. 1987); In re Interest of Ditter, 212 Neb. 279, 322 N.W.2d 642 (1982); In re Quenette, 341 N.W.2d 619 (N.D. 1983); In re Benigno-White, 223 N.J. Super. 72, 537 A.2d 1345 (N.J. Super.Ct.Ch.Div. 1987); In re Wagner, 209 Neb. 33, 305 N.W.2d 900 (1981). It is clear that the chancellor in this case considered Jacqueline Vance's potentially lengthy incarceration as one, albeit major, factor in his finding of substantial erosion. This issue is without merit.

III.
Jacqueline Vance argued to the trial court that Miss. Code Ann. § 93-15-103(3)(e) is unconstitutionally vague. The U.S. Supreme Court has stated, on the matter of vagueness, the following:
[A] statute which either forbids or requires the doing of an act in terms so *419 vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process.
Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127-28, 70 L.Ed. 322, 328 (1926). Vague laws do not allow fair warning so that the ordinary citizen may behave in a law-abiding manner. Grayned v. City of Rockford, 408 U.S. 104, 108-09, 92 S.Ct. 2294, 2298-99, 33 L.Ed.2d 222, 227-28 (1972). This Court provided, in Transcontinental Gas Pipeline Corp. v. State Oil and Gas Board, 457 So.2d 1298, 1323 (Miss. 1984), rev'd on other grounds, 474 U.S. 409, 106 S.Ct. 709, 88 L.Ed.2d 732 (1986):
An unconstitutionally vague statute or regulation is unenforceable. A.B. Small Co. v. American Sugar Refining Co., 267 U.S. 233, 242, 45 S.Ct. 295, 298, 69 L.Ed. 589, 594-5 (1924). Most of the void for vagueness cases have arisen in the context of criminal prosecutions. See ABC Interstate Theatres, Inc. v. State, 325 So.2d 123, 125 (Miss. 1976) (obscenity statute overbroad). It is clear, however, that the doctrine applies to civil statutes and regulations. See A.B. Small Co. v. American Sugar Refining Co., 267 U.S. at 237, 45 S.Ct. at 296, 69 L.Ed. at 592 (applied to civil statute); Hynes v. Mayor of Oradell, 425 U.S. 610, 620, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243, 253 (1976) (applied to regulation)... .
A rule or standard is not objectionable merely because it is stated in general terms and is not susceptible of precise application. Familiar examples of such general standards abound in our law, e.g., negligence, unconscionability, fraud. We doubt anyone would seriously argue today that these standards are unconstitutionally vague.
"A statute need embody only as much exactness as the subject matter permits." Yandell v. United States, 550 F. Supp. 572, 575 (N.D.Miss. 1982), aff'd per curiam, 712 F.2d 218 (5th Cir.1983). Statutes are presumed constitutional, and such presumption must be overcome by proof showing unconstitutionality beyond a reasonable doubt. Mississippi Power Co. v. Goudy, 459 So.2d 257, 263 (Miss. 1984).
A person of common intelligence should be aware, under § 93-15-103(3)(e), that the result of facts such as are provided here could well be the termination of one's parental rights. The constitutionally mandated burden of proof in this case, clear and convincing evidence, is at least as general a term as "substantial erosion." If the statute were more specific, then the cases in which it could be applied could be so drastically reduced as to make it ineffective in protecting the children it was meant to serve. Jacqueline Vance has not shown, beyond a reasonable doubt, that the statute is unconstitutionally vague.

IV.
Jacqueline Vance further argues that terminating her parental rights, in part because of her criminal acts and resulting imprisonment, amounts to cruel and unusual punishment. U.S. Const. amend. VIII; Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). The Eighth Amendment prohibition against cruel and unusual punishment is binding on the states through the Fourteenth Amendment. Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). Such action is also prohibited under the Mississippi Constitution, art. III, § 28.
Several states have addressed the question of whether a termination of parental rights amounts to cruel and unusual punishment. See State in Interest of C.P., 463 So.2d 899 (La. Ct. App. 1985); Matter of Anonymous, 104 Misc.2d 985, 429 N.Y.S.2d 987 (N.Y.Sur.Ct. 1980); Carignan v. State, 469 P.2d 656 (Okla. 1970). The termination of Jacqueline Vance's parental rights is a separate matter from that of her criminal convictions, though the first does result, in part, from the second. The action brought by the Lincoln County Welfare Department was not brought to further punish the appellant, but was a reasonable exercise of this state's legitimate interest in providing for the welfare of these children. This argument is meritless.

*420 V.
Jacqueline Vance alleges that because a proportionally higher number of blacks' parental rights are terminated than are whites', § 93-15-103 violates her right to equal protection under the Fourteenth Amendment.[1]
§ 93-15-103 is on its face racially neutral. When a racially neutral statute has a racially disproportionate impact, the plaintiff must show that there is a racially discriminatory intent or purpose behind the statute in order to show a violation of the right of equal protection. Hunter v. Underwood, 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985). The discriminatory purpose must have been a motivating factor behind the promulgation of the statute. Arlington Heights v. Metro. Housing Corp., 429 U.S. 252, 265-66, 97 S.Ct. 555, 563, 50 L.Ed.2d 450, 464-65 (1977); see also Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). We have been supplied with no evidence that the purpose of § 93-15-103 is anything other than the protection of the children of this state. The judgment of the chancery court is affirmed.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, BANKS and McRAE, JJ., concur.
NOTES
[1] Jacqueline Vance relies on statistics supplied by the Welfare Department showing the number of children in the custody of the Department awaiting adoption. Some of the children became available for adoption by voluntary parental release, and others through court-ordered termination of parental rights. Of the cases involving the latter, 65% involve black families. There is no testimony as to whether this 65% figure is a state-wide figure, or what time period is covered by this figure. There is no testimony, as suggested by Jacqueline Vance, that 65% of the termination cases in the state involve black families.