986 So.2d 999 (2007)
In re A.M.A., A Minor.
In re T.A., A Minor.
Nos. 2005-CA-01845-COA, 2005-CA-01846-COA.
Court of Appeals of Mississippi.
December 11, 2007.
Rehearing Denied April 15, 2008.
*1002 Leonard Brown Melvin, Hattiesburg, attorney for appellant.
Office Of the Attorney General by Myrick L. Jackson, attorney for appellee.
Before LEE, P.J., BARNES and ISHEE, JJ.
BARNES, J., for the Court.
¶ 1. This case comes before this Court on appeal from the Forrest County Youth Court's judgment terminating the parental rights regarding minor children T.A. ("Tammy") and A.M.A. ("Ashley").[1] Aggrieved by the judgment, P.C. ("Paul"), natural father of the two children, appeals, asserting that there was insufficient evidence to support a finding of neglect, insufficient evidence to support a finding of abandonment, and insufficient evidence to support a finding that Paul's incarceration was a continuing behavior sufficient to justify termination of his parental rights. We are without jurisdiction to decide the instant appeal; alternatively, we find that the termination of Paul's parental rights pursuant to section 93-15-103(3)(h) of the Mississippi Code was supported by substantial evidence.

SUMMARY OF THE FACTS AND PROCEDURAL HISTORY
¶ 2. Ashley was born on December 29, 1999, and Tammy was born December 4, 2000. Although the natural parents of these children were never married, Paul, the natural father of Ashley and Tammy, resided in the home with the children and their natural mother, D.A. ("Diane"), until January, 2001, when Paul was incarcerated pursuant to a charge of attempted robbery.[2] Following his release on probation *1003 in March, 2002, Paul resumed residence with the children and their mother until August, 2002. This period between March, 2002, and August, 2002, included a period of approximately one monthbetween July and August, 2002when the mother was incarcerated and Paul was the children's primary care-giver. After the mother was released in August, Paul moved out because of tension between the couple that he feared might lead to revocation of his probation. Paul continued to pursue a relationship with Tammy and Ashley by providing financial support and visiting with the children.
¶ 3. On or about Thursday, October 24, 2002, Paul stopped by Diane's residence to ask Diane if she needed anything and told her that, if she did, he would bring it the next day when he stopped by after work to visit Tammy and Ashley. When Paul returned on Friday, Ashley was in bed complaining that her arm was hurting. Examination by Paul revealed that her arm was swollen "from the elbow down like something had bit[ten] her." According to Paul, Diane refused to take Ashley to a doctor, stating that she had given Ashley some medicine. Diane also refused to allow Paul to seek medical treatment for Ashley. The following evening, Paul returned to Diane's residence. So that she would allow him to leave with Ashley, Paul told Diane that he wanted to take Ashley to the store with him. After leaving Diane's residence, Paul took Ashley to a doctor to have her arm examined. At the conclusion of the doctor's visit, Paul was instructed to bring Ashley back to the doctor within twenty-four hours. He was given a prescription for Ashley, which he had filled before returning the child to Diane. Paul informed Diane of the visit to the doctor and of the need to return Ashley for a follow-up the next day. Paul offered to have his mother take Diane and Ashley to the doctor if Diane was unable to find other transportation. Diane failed to take Ashley for the follow-up visit.
¶ 4. According to Paul, Diane did not allow him to see Ashley again until approximately ten days after the initial visit to the doctor, despite Paul's repeated attempts. Upon seeing Ashley, Paul noticed that her condition had not improved and decided, against Diane's wishes, to take the child to Forrest General Hospital. According to Paul, x-rays taken at Forrest General revealed that Ashley's elbow was fractured and had started healing in the wrong direction. At this point, on November 3, 2002, Forrest General Hospital submitted a report to the Forrest County Department of Human Services ("FCDHS") detailing Ashley's condition and the events preceding her diagnosis and treatment at the hospital. A FCDHS supervisor allowed Ashley to return home with Paul pending further investigation. When Paul went by Diane's residence to get some clothes for Ashley, Diane refused to allow Ashley to leave with Paul, threatening to call the police and have Paul's probation revoked. Paul contacted FCDHS to apprise them of the situation, and upon her arrival at Diane's residence, FCDHS social worker Jennifer McLaurin discovered deplorable living conditions in Diane's home, including no food and roach infestation. FCDHS promptly petitioned the Youth Court of Forrest County for temporary custody of Tammy and Ashley, which was granted on November 4, 2002. Paul, however, continued to visit and provide support for the children.
*1004 ¶ 5. On November 22, 2002, FCDHS petitioned the youth court to declare that both Tammy and Ashley were neglected within the meaning of section 43-21-105 of the Mississippi Code. At the neglect hearing on December 3, 2002, the youth court offered to appoint counsel for Paula request which Paul refused. The transcript of the hearing also reflects that Paul was aware that Ashley and Tammy would be placed in foster care. The youth court judge further informed Paul that if circumstances did not change, his parental rights would be terminated. Based in part on Ashley's injured arm and the lack of medical attention she received, and in part on the deplorable living conditions at Diane's residence, the youth court granted these petitions on December 3, 2002. As part of the court's adjudication, a permanency plan of reunification with the natural parents was ordered, and both Diane and Paul were ordered to enter into a service agreement with FCDHS to make reunification possible.
¶ 6. Paul was unable to complete the terms of his service agreement because his probation was revoked on January 22, 2003.[3] Diane also failed to abide by the terms of her service agreement. Consequently, the children, who were living in separate foster homes, remained in the legal custody of FCDHS. At the conclusion of the three-month review hearing held on June 17, 2003, the youth court ordered concurrent permanency plans of reunification and termination of parental rights ("TPR")/adoption.[4] The youth court conducted a six-month review hearing on December 16, 2003. Pursuant to this hearing, the youth court determined that no further efforts should be made to reunify the children with their parents and that a new permanency plan of TPR/adoption would be in the children's best interests.[5] To that end, both Tammy and Ashley were placed in the home of B.N. and V.N. on March 12, 2004, with the intent that the couple would eventually adopt the two children.
¶ 7. FCDHS filed a "Petition to Terminate Parental Rights" on behalf of Tammy and Ashley on April 8, 2004, pursuant to Mississippi Code Annotated section 93-15-105 (Supp.2006). Pertinent to this appeal, the petition alleged that "[t]here is substantial erosion of the relationship between the Minor Petitioner[s] and the Respondents... which was caused at least in part by ... prolonged and unreasonable absence, unreasonable failure to visit or communicate, constituting grounds for termination of their parental rights pursuant to Miss.Code Ann. 93-15-103(3)(f) (Supp. 2002)." After several continuances, a hearing was held on the matter and judgment terminating the parental rights of *1005 both parents was signed on January 20, 2005; however, judgment was not entered until after the post-termination of parental rights hearing on May 19, 2005.
¶ 8. The youth court based its judgment on the following conclusions.[6] (1) Paul did not have contact with the children for more than one year. See Miss.Code Ann. § 93-15-103(3)(b) (Rev.2004). (2) The children had been in the care and custody of DHS for more than one year, and Paul failed to exercise reasonable visitation and failed to implement a plan to allow DHS to return the children to him. See Miss.Code Ann. § 93-15-103(3)(d) (Rev.2004). (3) Paul failed to eliminate ongoing behavior which prevented placement of the children with him and Paul's "continued and current incarceration prevents placement of said child[ren] with the parent in spite of diligent efforts of the [DHS] to assist the parent." See Miss.Code Ann. § 93-15-103(3)(e) (Rev.2004). (4) There was a substantial erosion of the relationship between Paul and the children "which was caused at least in part by [Paul's] serious neglect, prolonged and unreasonable absence and unreasonable failure to visit or communicate." See Miss.Code Ann. § 93-15-103(3)(f) (Rev.2004). (5) The youth court noted that grounds for TPR pursuant to Mississippi Code Annotated section 93-15-103(3)(h) (Rev.2004) were met, citing the facts that both children had been adjudicated neglected, custody was transferred from their parents for placement pursuant to section 43-15-13, and a court of competent jurisdiction determined that reunification would not be in the best interests of the children.
¶ 9. Paul completed his sentence and was released on June 22, 2005.[7] Paul subsequently filed this appeal on September 9, 2005, asserting error by the youth court in that there was insufficient evidence of neglect on Paul's part, insufficient evidence to support a finding that Paul abandoned the children, and insufficient evidence to support a finding that Paul's incarceration was a continuing behavior justifying the termination of his parental rights. The crux of Paul's argument is that the only evidence of his abandonment, neglect, or negative continuing behavior was a result of his incarceration. Paul points out that he never intended to abandon Tammy or Ashley, and insists that he attempted to maintain contact with the children while incarcerated.[8] Also, Paul asserts that the only evidence that he neglected either Tammy or Ashley was the fact that he was incarcerated, pointing out that he was the one who sought medical treatment for Ashley's fractured arm, despite the protests of Ashley's natural mother. Further, *1006 Paul points to his rehabilitative accomplishments while he was incarcerated to demonstrate that he exhibits no continuing behavior justifying termination of his parental rights.[9]
¶ 10. As a preliminary matter, we must address the timeliness of Paul's appeal. Although neither party raised this issue in his or her initial briefing to this Court, the timeliness of appeals is a jurisdictional issue, and we must acknowledge our own lack of jurisdiction. Smith v. Parkerson Lumber, Inc., 890 So.2d 832, 834(¶ 12) (Miss.2003) (citing Michael v. Michael, 650 So.2d 469, 471 (Miss.1995)). "[I]f the notice of appeal is not timely filed, the appellate court simply does not have jurisdiction." Id. The notice of appeal in this case was filed more than thirty days after entry of judgment. We have examined the record, conducted our own research, and considered the additional briefing on this issue submitted by both parties to determine whether there is any basis  in the Mississippi Rules of Appellate Procedure or elsewhere-upon which we may assert jurisdiction over Paul's appeal. For reasons that we will now discuss, we find no basis to assert jurisdiction over Paul's out-of-time appeal.
¶ 11. As noted above, judgment was entered on May 19, 2005, but Paul's notice of appeal was not filed until September 9, 2005, some 113 days later. However, Paul filed a "Motion For Relief From Judgment Terminating Parental Rights and For a New Trial" pursuant to Mississippi Rules of Civil Procedure 60(b)(2)(3)(6) and 59(a) on June 29, 2005, approximately forty-two days after judgment was entered. This motion also contained a general prayer for relief in addition to the specific relief requested. A hearing on Paul's post-trial motion was conducted on August 11, 2005. According to the hearing transcript, Paul's counsel stated that neither he nor Paul had received notice of the judgment entered on May 19. Although the youth court judge denied the post-trial motion, the judge asked counsel if he would like additional time to file an appeal. Counsel for Paul answered affirmatively, and the youth court judge stated that he would enter an order making the time for appeal run from that day, August 11, 2005.
¶ 12. Paul subsequently filed his notice of appeal on September 9, 2005. The order denying Paul's June 29, 2005, post-trial motion was entered nunc pro tunc August 11, 2005, on March 7, 2006.[10] This order does not mention any extension or reopening of time to file notice of appeal. No other order of record appears reflecting the youth court's oral statement made at the August 11, 2005, hearing. However, even assuming the August 11, 2005, order did reflect the youth court's oral statement that the time for appeal would run from August 11, we nevertheless find that Paul's appeal was untimely pursuant to the strictures of the Mississippi Rules of Appellate Procedure.
¶ 13. According to Mississippi Rule of Civil Procedure 77(d), "[i]mmediately upon the entry of an order or judgment the clerk shall serve a notice ... *1007 upon each party...." However, subsection (d) states further that the "[l]ack of notice... by the clerk does not affect the time to appeal, nor relieve, nor authorize the court to relieve, a party for failure to appeal within the time allowed, except as permitted by the Mississippi Rules of Appellate Procedure." (Emphasis added). Accordingly, the youth court was powerless to grant Paul additional time to file his appeal absent any Mississippi Rules of Appellate Procedure provision authorizing the youth court to grant an extension or to allow an out-of-time appeal. We turn now to Rule 4 of the Mississippi Rules of Appellate Procedure which addresses the timeliness of appeals and the circumstances under which additional time may be granted.
¶ 14. Rule 4(a) requires that a party's notice of appeal be filed with the clerk of the trial court within thirty days of entry of the order or judgment from which appeal is taken. Subsection (d) makes the time for appeal begin to run upon the trial court's entry of an order disposing of certain post-trial motions, including motions made pursuant to Mississippi Rules of Civil Procedure 59 and 60. In order for the time for appeal to be tolled pursuant to this provision, however, the post-trial motion must be filed within ten days of the entry of the judgment or order from which appeal is taken. M.R.A.P. 4(d). In the case sub judice, Paul's post-trial motion was made some forty-two days after entry of the May 19 judgment; so Rule 4(d) did not operate to toll the beginning of the thirty-day time limitation prescribed by Rule 4(a).
¶ 15. Subsection (g) allows for an extension of time to file a notice of appeal by motion filed before or after the expiration of the thirty-day time period prescribed by subsection (a). M.R.A.P. 4(g). Motions for extension filed within the initial thirty-day time limit "may be granted for good cause." Motions filed after expiration of the thirty-day time limit "shall be granted only upon a showing of excusable neglect." Id. Pursuant to this rule, a trial court is authorized to grant an extension not to exceed thirty days past the original thirty-day filing period or ten days from the date of the order granting the extension is entered, whichever date is later. Id.
¶ 16. The practical effect of Rule 4(g) is that a party has a maximum of sixty days from the date the judgment or order appealed from is entered, or ten days from the date the order granting the motion for extension of time is entered, in which to file a notice of appeal. In the instant case, Paul's notice of appeal was filed approximately 113 days after the May 19, 2005, judgment was entered, well outside the sixty-day window. And, even if we liberally construe either the general prayer for relief contained in the June 29 motion, or the youth court's ore tenus offer for additional time made during the August 11 hearing and Paul's acceptance thereto as a motion for extension of time pursuant to Rule 4(g), we note that Paul's notice of appeal was not filed until September 9, 2005, more than ten days after the order entered nunc pro tunc August 11, 2005. Accordingly, even if Paul's failure to learn independently of the May 19 judgment in time to file his notice of appeal within thirty days constitutes "excusable neglect," we find that Paul's notice of appeal would still be untimely because it was filed beyond the maximum additional time allowed by Rule 4(g).[11]
*1008 ¶ 17. Rule 4(h) was added effective July 1, 1997, to address the precise situation which is presented in the instant case. According to the advisory committee historical note, the rule was added "to provide for reopening of time for appeal in the event that a notice of entry of judgment is not received." Rule 4(h) provides as follows:
The trial court, if it finds (a) that a party entitled to notice of the entry of a judgment or order did not receive such notice from the clerk or any party within 21 days of its entry and (b) that no party would be prejudiced, may, upon motion filed within 180 days of entry of the judgment or order or within 7 days of receipt of such notice, whichever is earlier, reopen the time for appeal for a period of 14 days from the date of entry of the order reopening the time for appeal.
M.R.A.P. 4(h). The record does not reflect the date upon which Paul received notice that judgment was entered on May 19. Consequently, we cannot determine whether the June 29 motion[12] was made within "7 days of receipt of such notice...." Regardless, Paul's notice of appeal was filed more than fourteen days after the August 11, 2005, entry of the relevant order allowing him additional time to file his notice of appeal.[13] Accordingly, the notice was not timely filed pursuant to Rule 4(h).
¶ 18. We are not persuaded by Paul's argument that "[t]he trial court has authority under MRCP 60(b) to grant an extension of time to appeal as appropriate, inasmuch as MRCP 60(b) has supplanted the extraordinary writs and bills, namely the Bill in the Nature of a Bill of Review." While we acknowledge that a trial judge has broad authority pursuant to Mississippi Rule of Civil Procedure 60(b) to grant relief from the judgment, this rule does not authorize a trial judge to extend, toll, reopen, or otherwise grant an appellant additional time in which to file a notice of appeal. In fact, it is only by virtue of Mississippi Rule of Appellate Procedure 4(d) that Rule 60(b) affects the time for filing a notice of appeal. To illustrate this point, we note that prior to the 1998 amendment to Rule 4(d), a post-trial Rule 60 motion would not extend the time for filing a notice of appeal at all, even if the motion was filed within ten days after entry of judgment. See M.R.A.P. 4(d) cmt.; Michael v. Michael, 650 So.2d 469, 471 (Miss.1995).[14]
*1009 ¶ 19. We also note that Paul has failed to cite any authority which would allow this Court to suspend Rule 4 in the context of a termination of parental rights case. While the comment to Rule 4 points out that "[i]n criminal cases, the Court may suspend this Rule 4 to permit out of time appeals," the comment states further that "[n]o such suspension, however, is permitted in a civil case." Accordingly, since this case is civil rather than criminal in nature, we are without authority to suspend Rule 4.
¶ 20. Although we find that Paul's notice of appeal was not timely filed, and hence, we are without appellate jurisdiction in this case, we nevertheless proceed to address the merits of this case in the interest of completeness and because of the significance of the issues presented. We find that, had we jurisdiction, we would affirm the merits of this case pursuant to section 93-15-103(3)(h) of the Mississippi Code.

STANDARD OF REVIEW
¶ 21. The burden of proof required to terminate parental rights is clear and convincing evidence. Miss.Code Ann. § 93-15-109 (Rev.2004). Our review of a judgment terminating parental rights, however, is limited to the manifest error/clearly erroneous standard of review. G.Q.A. v. Harrison County Dep't of Human Servs., 771 So.2d 331, 335(¶ 14) (Miss. 2000). Under this standard, we will uphold the Forrest County Youth Court's decision unless that decision is not supported by "substantial, credible evidence, giving deference to the [youth court's] findings of fact." Id. (citing S.C.R. v. F.W.K., 748 So.2d 693, 700(¶ 40) (Miss. 1999)). Accordingly, we must determine "`not how we would have decided the case ab initio but whether there would be credible proof from which a rational trier of fact [] may have found' as it did." D.J.L. v. Bolivar County Dep't of Human Servs., 824 So.2d 617, 620(¶ 10) (Miss.2002) (quoting Ethredge v. Yawn, 605 So.2d 761, 764 (Miss.1992)).

DISCUSSION
¶ 22. In Mississippi, as in other jurisdictions, there exists a strong presumption in favor of preserving parental rights. See In re V.M.S., 938 So.2d 829, 834(¶ 11) (Miss.2006). Only where that presumption is overcome by clear and convincing evidence is termination appropriate. Id. According to the Mississippi Supreme Court, "these parental rights may be abridged when the welfare of the children is threatened." Vance v. Lincoln County Dep't of Public Welfare, 582 So.2d 414, 417 (Miss. 1991). The Vance court recognized the judicial responsibilities for both parent and child as follows:
Although aware of the great responsibility placed upon any court when determining whether a parent's fundamental right to rear their offspring should be terminated, we think we would be remiss in our duties if we did not terminate the parental rights to safeguard the children['s] greater right to food, shelter, and opportunity to become useful citizens.
Id. (quoting Adams v. Powe, 469 So.2d 76, 78-79 (Miss.1985)).
*1010 ¶ 23. Our case law clearly establishes that a parent's right to be a parent and a child's right to safety, comfort, and nurture are serious matters to be given the utmost consideration when deciding whether to terminate parental rights. What is not clear, however, is at what point and after what parental conduct a child's "greater right to food, shelter, and opportunity to become a useful citizen" outweighs a "parent's fundamental right to rear their offspring." Vance, 582 So.2d at 417. In order to establish the appropriate balance between those respective rights, the Termination of Rights of Unfit Parents Law, found at Mississippi Code Annotated section 93-15-101 through XX-XX-XXX (Rev. 2004), provides statutory grounds for the termination of parental rights.
¶ 24. Mississippi Code Annotated section 93-15-103 (Rev.2004) sets forth, in pertinent part, the following factors justifying adoption, and grounds for the termination of parental rights:
(1) When a child has been removed from the home of its natural parents and cannot be returned to the home of his natural parents within a reasonable length of time because returning to the home would be damaging to the child or the parent is unable or unwilling to care for the child, relatives are not appropriate or are unavailable, and when adoption is in the best interest of the child, taking into account whether the adoption is needed to secure a stable placement for the child and the strength of the child's bonds to his natural parents and the effect of future contacts between them, the grounds listed in subsections (2) and (3) of this section shall be considered as grounds for the termination of parental rights. The grounds may apply singly or in combination in any given case.
(2) The rights of a parent with reference to a child, including parental rights to control or withhold consent to an adoption, and the right to receive notice of a hearing on a petition for adoption, may be relinquished and the relationship of the parent and child terminated by the execution of a written voluntary release, signed by the parent, regardless of the age of the parent.
(3) Grounds for termination of parental rights shall be based on one or more of the following factors:
....
(b) A parent has made no contact with a child under the age of three (3) for six (6) months or a child three (3) years of age or older for a period of one (1) year; or
....
(d) When the child has been in the care and custody of a licensed child caring agency or the Department of Human Services for at least one (1) year, that agency or the department has made diligent efforts to develop and implement a plan for return of the child to its parents, and:
(i) The parent has failed to exercise reasonable available visitation with the child; or
(ii) The parent, having agreed to a plan to effect placement of the child with the parent, fails to implement the plan so that the child caring agency is unable to return the child to said parent; or
(e) The parent exhibits ongoing behavior which would make it impossible to return the child to the parent's care and custody:
(i) Because the parent has a diagnosable condition unlikely to change within a reasonable time such as alcohol or drug addiction, severe mental deficiencies or mental illness, or extreme physical incapacitation, which condition makes *1011 the parent unable to assume minimally, acceptable care of the child; or
(ii) Because the parent fails to eliminate behavior, identified by the child caring agency or the court, which prevents placement of said child with the parent in spite of diligent efforts of the child caring agency to assist the parent; or
(f) When there is an extreme and deep-seated antipathy by the child toward the parent or when there is some other substantial erosion of the relationship between the parent and child which was caused at least in part by the parent's serious neglect, abuse, prolonged and unreasonable absence, unreasonable failure to visit or communicate, or prolonged imprisonment; or
....
(h) The child has been adjudicated to have been abused or neglected and custody has been transferred from the child's parent(s) for placement pursuant to Section 43-15-13, and a court of competent jurisdiction has determined that reunification shall not be in the child's best interest.
Miss.Code Ann. § 93-15-103(1)-(3) (Rev. 2004).
¶ 25. In the instant case, the youth court judge, having found the threshold requirements of Mississippi Code Annotated section 93-15-103(1) to be satisfied, based his judgment terminating the parental rights of Paul on the following factual conclusions: (1) Paul did not have contact with the children for more than one year; (2) the children had been in the care and custody of DHS for more than one year, and Paul failed to exercise reasonable visitation and failed to implement a plan to allow DHS to return the children to him; (3) Paul failed to eliminate ongoing behavior which prevented placement of the children with him and Paul's "continued and current incarceration prevents placement of said child[ren] with the parent in spite of diligent efforts of the [DHS] to assist the parent"; (4) there was a substantial erosion of the relationship between Paul and the children "which was caused at least in part by [Paul's] serious neglect, prolonged and unreasonable absence and unreasonable failure to visit or communicate"; and (5) grounds for TPR pursuant to section 93-15-103(3)(h) of the Mississippi Code were met, because both children had been adjudicated neglected, custody was transferred from their parents for placement pursuant to section 43-15-13, and a court of competent jurisdiction determined that reunification would not to be in the best interests of the children. As will be discussed herein, Paul's incarceration contributed to the circumstances which led to the youth court's factual conclusions. We will first determine the propriety of considering a parent's incarceration in the context of a TPR proceeding, and then apply that determination to the specific factual conclusions reached by the youth court judge in terminating Paul's parental rights.

I. WHETHER AND TO WHAT EXTENT A PARENT'S INCARCERATION SHOULD BE CONSIDERED IN TERMINATING THAT PARENT'S PARENTAL RIGHTS.
¶ 26. On appeal, Paul argues that there "is insufficient credible evidence to support a finding of neglect on Appellant's part,... insufficient credible evidence to support the court's finding of abandonment by the Appellant, ... and insufficient evidence to support that Appellant's incarceration is a continuing behavior justifying the termination of his parental rights." While Paul failed to address the majority of the grounds for termination outlined by the youth court, and devoted the majority *1012 of his argument to the issue of abandonment, a ground that was neither alleged by DHS nor cited by the youth court as a basis for termination, we note that the crux of Paul's argument is that, but for his incarceration, his conduct would not satisfy any of the statutory bases for termination. Therefore, Paul insists that termination of his parental rights was, in effect, based on his incarceration. To support his contention that his incarceration was the predominant factor in preventing him from having a parental relationship with Tammy and Ashley, Paul points to his visitations with and support of Tammy and Ashley prior to his probation being revoked and to the fact that he sought medical care for Ashley over Diane's protests. In addition, although not corroborated by any DHS employees, Paul testified at the TPR hearing that while incarcerated, he attempted numerous calls to DHS to check up on his children, sent letters to his children through DHS, and sent Christmas gifts to Tammy and Ashley through a charitable organization that donated gifts to children of incarcerated parents.
¶ 27. We agree that Paul's efforts to exercise his parental rights and fulfill his parental responsibilities were frustrated by the revocation of his probation and subsequent incarceration. We must now determine whether Paul's incarceration excuses his inability to exercise those rights and fulfill those responsibilities, and consequently, whether Paul's parental rights may be terminated pursuant to statutory grounds listed in section 93-15-103(3) of the Mississippi Code when those grounds would not have been satisfied absent his incarceration. In so determining, we must keep in mind that Paul's parental rights are to be considered not in isolation, but with due regard for the rights of Tammy and Ashley.
¶ 28. In Vance v. Lincoln County Dep't of Pub. Welfare, 582 So.2d 414 (Miss.1991), the Mississippi Supreme Court considered the termination of parental rights of a mother convicted of murder and armed robbery and sentenced to a fifty-four year prison term. The only statutory ground for termination at issue in Vance was section 93-15-103(3)(e), which provides for termination when "there is ... substantial erosion of the relationship between the parent and child which was caused at least in part by the parent's serious neglect, abuse, prolonged and unreasonable absence, unreasonable failure to visit or communicate, or prolonged imprisonment." Vance, 582 So.2d at 417. In affirming the lower court's termination of the mother's parental rights, our supreme court found that substantial erosion had taken place in that a bad relationship eroded into "one that is practically non-existent." Id. at 418. Furthermore, the supreme court found that there was no viable alternative to termination, as the mother's criminal conduct was "tantamount to an abandonment." Id.
¶ 29. In addressing the mother's argument "that the lower court erred in terminating her parental rights based solely on her incarceration," the court in Vance recognized that "imprisonment of a parent is not [a] sufficient reason per se to terminate parental rights." Id. However, "[i]mprisonment, and the resulting conditions, can be rightfully considered as a significant factor when determining whether rights may be terminated." Id. (citations omitted). Accordingly, the Vance court held that the chancellor properly considered the mother's "potentially lengthy incarceration as one, albeit major, factor in his finding of substantial erosion." Id.
¶ 30. In Gunter v. Gray, 876 So.2d 315 (Miss.2004), Theresa, mother of the two minors at issue, petitioned to have the parental rights of her ex-husband, *1013 and father of their two mutual children, terminated. At the time Theresa's petition was considered, the father was incarcerated for telephone harassment. Theresa pointed to the supreme court's holding in Vance, that "imprisonment, and the resulting conditions, can be rightfully considered as a significant factor when determining whether rights may be terminated," to support her petition. Gunter, 876 So.2d at 321(¶ 29) (citing Vance, 582 So.2d at 418). The supreme court rejected Theresa's argument, however, citing the factual differences between the respective cases. In Gunter, the evidence established that there was a strong bond between the father and the two children, unlike the "substantial erosion" found between the mother and children in Vance. Also, the father's prospective prison sentence in Gunter was nowhere near the length of the mother's sentence in Vance.
¶ 31. Basing the termination of parental rights upon statutory grounds that would not have been met but for the incarceration of a parent equates, in effect, to basing the termination solely on the parent's incarceration in violation of our supreme court's statement in Vance that, "imprisonment of a parent is not sufficient reason per se to terminate parental rights." See Vance, 582 So.2d at 418; see also In re Clark, 26 Wash.App. 832, 835, 611 P.2d 1343 (Wash.Ct.App.1980) (stating that imprisonment is not sufficient by itself to terminate parental rights); J. v. State Dep't of Public Welfare, 543 S.W.2d 9, 11 (Tex.Civ.App.1976) (stating that although imprisonment is not sufficient in and of itself to establish abandonment, it may be sufficient where "such imprisonment is the result of, or is coupled with, a voluntary, deliberate and conscious course of conduct which has the effect of placing or allowing the children to remain in conditions which endanger their physical or emotional well-being...."); In re Interest of Wagner and Russell, 209 Neb. 33, 36, 305 N.W.2d 900, 902 (1981) (stating that "parental rights should not be terminated for the sole reason of conviction of crime and incarceration"). In so holding, we have also considered the judicial wisdom of various jurisdictions which have declined to excuse a parent's failure to fulfill his parental responsibilities based on his incarceration. See, e.g., In re Pasquale "U", 279 A.D.2d 906, 907, 720 N.Y.S.2d 581 (2001) (stating that incarceration did not excuse parent's failure to maintain contact for six months); In re Matthew "YY", 274 A.D.2d 685, 688, 710 N.Y.S.2d 460 (N.Y.App.Div.2000) (finding that incarceration was not a valid excuse for father's failure to maintain sufficient contact during the relevant statutory time period); Zgleszewski v. Zgleszewski, 260 Ark. 629, 632, 542 S.W.2d 765, 768 (1976) (stating that "we are not willing to completely toll a parent's responsibilities during his or her incarceration").
¶ 32. We now address each ground upon which the youth court based its judgment terminating Paul's parental rights to determine whether there is substantial evidence to support the youth court's judgment apart from circumstances solely attributable to Paul's incarceration.

II. WHETHER THE FACTUAL CONCLUSIONS UNDERLYING THE FORREST COUNTY YOUTH COURT'S JUDGMENT TERMINATING PAUL'S PARENTAL RIGHTS WERE BASED ON SUBSTANTIAL EVIDENCE APART FROM CIRCUMSTANCES CAUSED BY HIS INCARCERATION.

A. Whether TPR was proper pursuant to Mississippi Code Annotated section 93-15-103(3)(b) (Rev.2004).
¶ 33. The first basis supporting TPR was the youth court's conclusion that *1014 Paul did not have contact with the children for more than one year. If supported by substantial evidence, this factual conclusion would justify TPR pursuant to section 93-15-103(3)(b) of the Mississippi Code. We find that the youth court erred by basing the termination of Paul's parental rights on this ground as the undisputed testimony at the TPR hearing was that Paul attempted several phone calls to FCDHS in an effort to maintain contact with the children. Also, Paul sent Christmas gifts to Tammy and Ashley through a charitable organization, and sent letters to the children through FCDHS. While no FCDHS employee could corroborate these efforts by way of testimony at the TPR hearing, they could also not positively refute Paul's assertions. Furthermore, all indications are that, had Paul not been incarcerated, he would have continued the care and support that he exhibited prior to incarceration.

B. Whether TPR was proper pursuant to Mississippi Code Annotated section 93-15-103(3)(d) (Rev.2004).
¶ 34. The youth court next concluded that the children had been in the care and custody of DHS for more than one year, and Paul failed to exercise reasonable visitation and failed to implement a plan to allow DHS to return the children to him, making TPR proper based on section 93-15-103(3)(d). While Paul does not dispute this factual conclusion, the only reason identified in the record for his failure to exercise reasonable visitation or to implement a plan for reunification was because of his incarceration. During his incarceration, the children were placed with foster parents who were not required to ensure Paul's continued contact with his children. Furthermore, without someone to bring Tammy and Ashley to the jail for visitation, it would have been impossible for Paul, while he was incarcerated, to comply with the terms of the service agreement which required him to maintain regular visitation with Tammy and Ashley. Accordingly, we find that there is no substantial evidence to support this TPR ground apart from the circumstances that existed solely because of Paul's incarceration.

C. Whether TPR was proper pursuant to Mississippi Code Annotated section 93-15-103(3)(e) (Rev.2004).
¶ 35. The youth court's third ground for TPR is based on section 93-15-103(3)(e). According to the court's conclusion, Paul failed to eliminate ongoing behavior which prevented placement of the children with him and Paul's "continued and current incarceration prevents placement of said child[ren] with the parent in spite of diligent efforts of the [DHS] to assist the parent." We could not find any reference in the record to the "ongoing behavior" that Paul failed to eliminate. While Paul's probation was revoked in part because of positive drug tests administered on two separate occasions, the second one occurring after his children had been placed in foster care and after he was informed of the gravity of the situation and ultimate consequences, there is no indication that his drug abuse was singled out by either DHS or the court as the continuing behavior preventing placement of the children with him. In light of the fact that the youth court's factual conclusion mentions that Paul's incarceration prevents placement of the children with him, we would not affirm based on this ground. As there is no other "continuing behavior" evident in either the record or in the youth court's factual conclusion, we must assume that this statutory ground was met solely because of Paul's incarceration. As such, there is no substantial evidence, beyond the circumstances created by Paul's incarceration, *1015 justifying TPR pursuant to this statutory ground.

D. Whether TPR was proper pursuant to Mississippi Code Annotated section 93-15-103(3)(f) (Rev.2004).
¶ 36. The youth court judge also concluded that there was a substantial erosion of the relationship between Paul and the children "which was caused at least in part by [Paul's] serious neglect, prolonged and unreasonable absence and unreasonable failure to visit or communicate." This conclusion, if true, would satisfy the TPR ground found at section 93-15-103(3)(f). We find that there is no substantial evidence to support this TPR ground as the record contains insufficient evidence that the relationship between Paul and his children had "substantially eroded."
¶ 37. During the TPR hearing, the prospective adoptive mother, B.N., testified that the children never asked about Paul, and referred to him as "Paul, the guy who took Ashley to the hospital." B.N. testified further that although she and her husband never attempted to undermine any feelings that the children had for Paul, the children refer to her and her husband as "mom and dad." Georgia McCullum, an adoption specialist assigned to Tammy and Ashley, testified that she never heard Ashley or Tammy refer to Paul at all. She testified to the strong bond that had developed between B.N., V.N., and the children, and corroborated B.N.'s testimony that both children referred to them as "mom and dad." We find this evidence insufficient to establish substantial erosion. In Vance, our supreme court found substantial erosion where a bad relationship between parent and child had eroded into "one that is practically non-existent." Vance, 582 So.2d at 418. Here, all indications are that the relationship between Paul and his children was at least amicable prior to his incarceration, as he testified that he regularly visited the children and even provided their primary care while Diane was incarcerated for approximately one month. Furthermore, Paul's approximately seventeen months of incarcerationfrom January 2003 to June 2004  does not compare to the fifty-four year sentence facing the parent in Vance, which that court held to be a "potentially lengthy incarceration" properly considered by the chancellor as "one, albeit major, factor in his finding of substantial erosion." Id. Accordingly, this ground for TPR is not supported by substantial evidence.

E. Whether TPR was proper pursuant to Mississippi Code Annotated section 93-15-103(3)(h) (Rev.2004).
¶ 38. Finally, the youth court judge concluded that grounds for TPR pursuant to section 93-15-103(3)(h) were met, because both children had been adjudicated neglected, custody was transferred from their parents for placement pursuant to section 43-15-13, and a court of competent jurisdiction determined that reunification would not to be in the best interests of the children. We find substantial evidence to support this TPR ground, as the children were adjudicated neglected prior to Paul's incarceration, custody had been transferred prior to his incarceration, and the youth court determined that reunification would not be in the best interests of the children at the three month and six month reviews, although these reviews occurred after Paul's incarceration.
¶ 39. In addressing this ground for termination of his parental rights, Paul contends that the youth court erroneously held in its TPR judgment that he neglected his children, and therefore, erred by listing section 93-15-103(3)(h) as grounds for terminating Paul's parental rights. In particular, Paul asserts that "[t]he court found that there was clear and convincing *1016 evidence demonstrating that Appellant had neglected his children." Paul cites the fact that he attempted to contact Tammy and Ashley through DHS while he was incarcerated to refute what he perceives as the youth court's determination that he neglected the children. In addition, Paul points out the fact that it was through his efforts that Ashley received medical care for her fractured elbow. Further, because of his efforts, the children's situation was brought to the attention of DHS. We find Paul's argument unpersuasive.
¶ 40. Mississippi Code Annotated section 93-15-103(3)(h) makes the termination of parental rights proper when "the child has been adjudicated to have been abused or neglected and custody has been transferred from the child's parent(s) ... and a court of competent jurisdiction has determined that reunification shall not be in the child's best interest." We find that the requirements of this TPR provision were met in the case sub judice, as both Tammy and Ashley were adjudicated neglected prior to the TPR judgment, their custody had been transferred from their parents, and a court of competent jurisdiction had determined that reunification was not in the best interest of the children.
¶ 41. The first requirement for TPR under section 93-15-103(3)(h) is that there have been an adjudication of neglect. Contrary to Paul's argument on appeal, "neglect" is not a label that is placed upon a parent, but a label that is placed upon a child. According to Mississippi Code Annotated section 43-21-105(l) (Rev.2004), a child may be adjudicated neglected if that child's "parent, guardian or custodian or any person responsible for his care or support, neglects or refuses, when able so to do, to provide for him proper and necessary care or support, ... or medical, surgical, or other care necessary for his well-being... or (iv)[w]ho, for any reason, lacks the care necessary for his health, morals or well-being." There is nothing in the language of section 93-15-103(3)(h), or in the language of section 43-21-105(l) which requires that an adjudication of neglect be made specifically with respect to the parent whose rights are being terminated. Indeed, the language of the neglect statute defines a "neglected child"  not a "neglecting parent"and defines a "neglected child" in such a way that both parents have the responsibility to insure that a child is not being neglected, regardless of who the custodial parent is. In other words, if a child is being neglected by the custodial parent, that child is also being neglected by the non-custodial parent if that parent fails to remedy the situation when he or she is able to do so. See Miss.Code Ann. § 43-21-105 (Supp.2006) (defining "neglected child" by the "neglect or refusal" of a parent or other responsible person to provide necessary care or support). We find this requirement was met in this case as the neglect referenced by the youth court in adjudicating Ashley and Tammy neglected occurred prior to Paul's incarceration, and therefore, Paul was able to take further steps to alleviate the neglect.
¶ 42. In the case before this Court, Tammy and Ashley were adjudicated neglected based on the living conditions at Diane's house and also because of Ashley's fractured elbow that went untreated for at least ten days. While Paul did initiate, against Diane's wishes, medical care for Ashley's arm, he failed to follow-up as directed by the treating physician when he knew or should have known that Diane would not follow-up with the physician. Paul knew that Diane opposed Ashley's seeing a doctor, yet he allowed Ashley to remain with Diane, untreated, for ten additional days before taking Ashley back to see a doctor. Because of this *1017 delay, Ashley's bones began healing incorrectly. In addition to the medical neglect, Paul was undoubtedly aware of the living conditions that Tammy and Ashley were forced to endure, as he had lived at the very same residence in the past. He also undoubtedly witnessed the continuing nature of the living conditions when he came for his regular visits with the children. According to the language of the "neglected child" statute, Tammy and Ashley were neglected as much because of Paul's inaction as they were because of anything Diane did or did not do.
¶ 43. The second requirement for TPR under section 93-15-103(3)(h) is that custody of the children must have been transferred from the child's parent(s) for placement. There is no question that the custody of Ashley and Tammy was transferred from the parents for foster care placement prior to Paul's incarceration. Paul does not dispute this fact, nor does he make any assertions as to why this measure was not in the best interests of the children under the circumstances. Paul did not respond to FCDHS's petition for temporary custody filed on November 4, 2002, nor did he respond to the neglect petition filed on November 22, 2002. Paul was present during the neglect hearing, was aware that the children would be placed in foster care, and refused the youth court's offer of court-appointed counsel. The youth court judge even explained to Paul during the neglect hearing that, if circumstances did not change, measures would eventually be employed to terminate his parental rights. We have no doubt that Paul understood the gravity of the situation and failed to challenge FCDHS's efforts to place the children in foster care, despite being offered the services of court-appointed counsel. Thereafter, he continued behavior, including the use of cocaine, which resulted in the revocation of his probation, making reunification impossible.
¶ 44. We also find that there is no dispute as to satisfaction of the third requirement under this TPR provision. The youth court determined, in its six-month review order, that reunification would not be in the best interest of Ashley and Tammy, and ordered a new permanency plan of TPR/adoption. Although Paul was incarcerated at the time that the order was entered, the record reflects that Paul never contested the order, nor does he contest the propriety of that order now on appeal. In dispensing with the permanency plan of reunification, the youth court and FCDHS were complying with the mandate of section 43-15-13(4) that termination of parental rights be initiated within six months for children under the age of three. Since a court of competent jurisdiction has determined that reunification was not in Ashley's and Tammy's best interests, we find that the final requirement for TPR under section 93-15-103(3)(h) met. Accordingly, the Forrest County Youth court did not err by granting FCDHS's petition for the termination of Paul's parental rights with respect to Ashley and Tammy.

CONCLUSION
¶ 45. Because Paul's notice of appeal was not timely filed in this case, we are without jurisdiction and are left with no alternative but to dismiss the appeal. Nevertheless, having considered the merits of Paul's appeal, we find that since Mississippi Code Annotated section 93-15-103(3) authorizes the termination of parental rights based on "one or more" of the grounds listed in subsections (a) through (h), our consideration of the merits of this case compels the conclusion that termination of Paul's parental rights was proper pursuant to the one ground supported by substantial evidence. Accordingly, based *1018 on the merits of this case, we would affirm the judgment of the Forrest County Youth Court based on Mississippi Code Annotated section 93-15-103(3)(h).
¶ 46. THE APPEAL FROM THE FORREST COUNTY YOUTH COURT IS DISMISSED FOR LACK OF JURISDICTION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO FORREST COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., CHANDLER, GRIFFIS, ISHEE AND CARLTON, JJ., CONCUR. IRVING, J., CONCURS IN RESULT ONLY. ROBERTS, J., CONCURS IN PART AND IN RESULT.
NOTES
[1] Based on the nature of the proceedings and the involvement of minors, we will use fictitious names for the children as well as for the natural and adoptive parents.
[2] Although the record repeatedly refers to Paul's incarceration as being pursuant to his plea of guilty to attempted robbery, we note that Paul's incarceration of fourteen months was actually served prior to his guilty plea. Contained in the record is an "Entry of Guilty Plea and Judgment of Court" entered on February 26, 2002. Pursuant to this judgment, Paul was sentenced to five years with all but time served suspended.
[3] According to the revocation order, Paul tested positive for cocaine on September 19, 2002, and again on January 16, 2003, failed to maintain employment, was $280 in arrears on his $30 monthly payments to the Department of Corrections, and failed to pay a fine of $1,000 which was part of his attempted robbery sentence. Evidently, Paul continued his use of drugs and other conduct in violation of his probation despite his knowledge that his children had been placed in foster care and his parental rights might eventually be terminated if a permanency plan of reunification could not be achieved.
[4] Mississippi Code Annotated section 43-15-13(8) (Supp.2006) authorizes the Department of Human Services to conduct concurrent planning "so that a permanent living arrangement may occur at the earliest possible opportunity."
[5] Mississippi Code Annotated section 43-15-13(4) (Supp.2006) mandates that if the terms of a parental service agreement have not been met, then termination of parental rights shall be initiated within six months for children under the age of three, absent documented compelling and extraordinary circumstances.
[6] Although the judgment did not list the specific statutory subsections applicable to each of the factual conclusions outlined, we have identified the applicable subsections and have included the relevant citation following our paraphrases of the conclusions contained in the judgment.
[7] We note that this was an early release date that Paul earned for good behavior and rehabilitative efforts while incarcerated. At the time the TPR hearing was conducted, however, the exact date of Paul's release was uncertain, and there remained a possibility that Paul would be incarcerated until November 24, 2006.
[8] Paul testified at the TPR hearing that during his incarceration, he placed several phone calls to the Forrest County DHS, sent Christmas gifts to the children through a charitable organization, and sent several letters to Tammy and Ashley through DHS. While no DHS representative testifying at the hearing recalled any of these efforts, it was acknowledged that the Forrest County DHS had experienced several personnel changes with the handling of Tammy and Ashley's cases, and that Paul's assertions could not be positively ruled out.
[9] According to Paul, he received treatment for drug and alcohol abuse, became a practicing Muslim, and received vocational training while in prison.
[10] As noted by our supreme court, "[n]unc pro tunc merely describes inherent power of [the] court to make its records speak the truth, i.e., to record that which is actually but is not recorded.... Nunc pro tunc signifies now for then, or in other words, a thing is done now, which shall have same legal force and effect as if done at time when it ought to have been done." In re D.N.T., 843 So.2d 690, 697 n. 8 (Miss.2003) (quoting Black's Law Dictionary 964 (5th ed.1979)).
[11] In Harlow v. Grandma's House, Inc., 730 So.2d 73, 76(¶ 16) (Miss. 1998), the supreme court noted that "[t]he official comment to M.R.A.P. 4(g) states mere failure to learn of the entry of the judgment is generally not a ground for showing excusable neglect." Finding that the appellant's only complaint was that "she failed to receive a copy of the order from the clerk of the circuit court, [the appellant] has not and cannot show excusable neglect." Id. As Paul's excuse for failing to timely file his notice of appeal is also that he did not receive timely notice of the May 19 judgment, we must similarly conclude that Paul has not made a showing of excusable neglect.
[12] As alluded to above, we construe the general prayer for relief contained in the June 29 post-trial motion as sufficient to request a reopening of time for appeal.
[13] As mentioned, the youth court judge's ruling that the time for appeal would run from August 11, 2005, appears only in the transcript of the August 11 hearing, although the judge stated that he would enter an order to that effect. The actual order that was entered denying Paul's post-trial motion nunc pro tunc August 11, 2005, does not contain any order which would affect the time for appeal in this case. We asked, in the additional briefing requested by the Court, whether there is anything the youth court could do at this pointby entering an order reopening time for appeal or otherwiseto remedy this Court's lack of jurisdiction, but both parties responded in the negative.
[14] In Michael, the supreme court held as follows:

Whether raised by the parties or not, this Court is required to note its own lack of jurisdiction. Because Ronald's motion to re-open this case was under Rule 60 M.R.C.P. rather than Rule 59, it did not toll Judy's time to file her notice of appeal. Therefore Judy's notice of appeal filed January 8, 1993, from the October 8, 1992, judgment was not timely. We do not have jurisdiction, therefore, to address Judy's assignment of error that the chancellor erred in dismissing her complaint for divorce.
Michael, 650 So.2d at 471 (internal citations omitted).